

David Williams, Asst. U.S. Atty. (William L. Lutz, U.S. Atty. and Joe M. Romero, Jr., Asst. U.S. Atty., on the briefs), Albuquerque, N.M., for plaintiff-appellant.

R. Morgan Lyman, Las Cruces, N.M., for defendant-appellee.

**UNITED STATES of America, Plaintiff–Appellant,**

v.

**Enrique CARREON, Defendant–Appellee.**

**No. 88–2002.**

United States Court of Appeals, Tenth Circuit.

April 18, 1989.

Before HOLLOWAY, Chief Judge, and BARRETT and LOGAN, Circuit Judges.

BARRETT, Senior Circuit Judge.

The United States seeks reversal of the district court's order granting defendant-appellee Enrique Carreon's (Carreon) Motion to Suppress evidence (approximately 50 kilograms or some 101 pounds of marijuana) found in his pickup truck by United States Customs Inspector John Gordon (Gordon) during a search conducted at the Antelope Wells, New Mexico, Customs Station located at the border between the United States of America and the Republic of Mexico.

The search conducted by Gordon on February 27, 1988, resulted in discovery of the marijuana secreted inside a compartment located in the camper wall of Carreon's pickup truck. Thereafter, Carreon was indicted, charged with importing into the United States less than fifty kilograms of marijuana in violations of 21 U.S.C. § 952(a), 21 U.S.C. § 960(a)(1) and 21 U.S.C. § 960(b)(4), and with possessing less than fifty kilograms of marijuana with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 841(b)(1)(D).

Prior to trial, Carreon filed his Motion to Suppress the evidence. In his motion, Carreon recognized that the government has the right to conduct routine border searches to control the movement of people and goods across our national boundaries, but he contended that "[a] 3½ hour detention and a drilling into the truck violates the standard of reasonableness under the Fourth Amendment" and "[t]hat reasonableness is determined by weighing the warranted suspicion of the border official against the offensiveness of the intrusion." (R., Vol. I, Tab 11, p. 2).

*The Evidentiary Hearing and Decision*

An evidentiary hearing was held on Carreon's motion on May 9, 1988, pursuant to Rule 12(b)(3), Fed.R.Crim.P. The government, in apparent recognition that it was obliged to carry the burden of proof on the reasonableness of Gordon's search and seizure actions, offered the testimony of Mr. Gordon. Counsel for the defendant did not cross-examine Gordon and he did not call the defendant or other witnesses. The defendant offered no evidence.

The undisputed facts based upon Customs Inspector Gordon's testimony follow. At approximately 10:00 a.m. on February 27, 1988, Carreon drove his 1973 Chevrolet pickup truck, with attached camper, into the United States Customs Service station located at Antelope Wells, New Mexico, on the border between the United States of America and the Republic of Mexico. Customs Inspector Gordon, the sole officer at the station, met the vehicle. Accompanying Carreon were two other passengers, a lady and a child. In accordance with normal procedures, Gordon, who had served sixteen and one-half years as a customs inspector, asked Carreon to declare any property he was bringing into the United States. Mr. Carreon declared some clothing contained in a bag, and upon inquiry he declared United States citizenship and residence in the State of California.

Officer Gordon, again in keeping with normal procedure, then asked Mr. Carreon to step out of the vehicle so that he (Gordon) could inspect the vehicle. Gordon had determined to conduct a good inspection of the vehicle because he noticed that Mr. Carreon was nervous. Gordon stated that when he addressed Carreon, he looked away and that Carreon was shaking when he handed Gordon his documents.

Gordon stated that during the course of his service as a customs inspector at various border "ports" he had made approximately five hundred narcotics seizures similar to that effected in this case.

Gordon next requested that the lady and child remove from the pickup so that he could conduct the inspection. Gordon accompanied the lady and child to the nearby customs station after calling his wife over from their house trailer located about forty feet from the station. Gordon asked his wife to give the lady a pat down search to determine if she possessed any weapons and then to keep an eye on them while he (Gordon) conducted the vehicle inspection.

Gordon observed that the nuts on each of the six bolts, which held the camper shell on the truck, were shiny, indicating the nuts had been recently removed. He next observed that the front part of the camper shell was very thick, containing a wide space. Gordon, with the use of a coathanger, determined that the top part of the camper shell was hollow. He then thumped around the bottom portion of the camper shell while on his knees inside the camper and determined that it was solid. Officer Gordon stated that he then knew that there was something in the lower portion of the compartment. This colloquy followed:

Q. MR. ROMERO (Assistant U.S. Attorney) Had you discovered in previous searches of other vehicles similar compartments?

A. Well, I ...

MR. LYMAN (Counsel for Mr. Carreon): I object, Your Honor ...

THE COURT: Pardon me?

MR. LYMAN: Relevance as to previous searches.

THE COURT: Sustained.

(R., Vol. II, p. 8).

Officer Gordon, after detecting that the bottom portion of the camper compartment

was solid, escorted Mr. Carreon to the nearby station and placed him in a lock-up detention room for safety reasons and to prevent Carreon's escape to the nearby border. Gordon then obtained his small electric drill, plugged it in on the outside of the station and proceeded to drill a hole in the lower portion of the compartment. Gordon testified that he then detected a substance, which he believed looked and smelled like marijuana residue, come out of the compartment. Again, the following colloquy occurred:

MR. LYMAN: We would object to that and request that it be stricken from the—

THE COURT: Sustained. It will be stricken.

*Id* at p. 12.

Further inspection revealed that the secret compartment contained 101 pounds of marijuana. Carreon was placed under arrest at approximately 10:55 a.m. on February 27, 1988.

Immediately following Officer Gordon's undisputed testimony, the court ruled, stating:

Well, the Court is going to grant the Motion to Suppress. It occurs to me that the mere suspicion on Mr. Gordon, here, is totally unwarranted. I—I really don't care what experience he's had. His recitation of the events surely would not have warranted a magistrate to issue a search warrant and I find it rather offensive that he stopped these people and asks his wife to pat down the—the wife of the defendant and that he then incarcerates the defendant and somehow or other he makes the distinction that he was not under arrest but he was merely detained in a cell. I find that incredulous.

But merely to—that—he states that he found this man and that he was a classic case of nervousness and on that he starts looking over the vehicle with a—with a clothes hanger.

And then on top of that to drill a portion of the—to take an electric drill and to drill into what he considers to be a compartment. The end doesn't justify the—the means.

I understand the US Attorney has to proceed on whatever they're provided, but this is a classic case of intrusion. An unconstitutional intrusion and I'm appalled at what apparently what this man is doing at the border.

The Court is going to sustain the—I'm going to grant the motion to suppress.

MR. ROMERO: Your Honor, just for the record, if I could state, there—is it my understanding that there was no requirement of probable cause at the border?

THE COURT: Absolutely. Now, he's permitted to inspect, but he had nothing to warrant the extreme inspection that he made. And the fact that he claims that he found something that sounded solid, rather than hollow, that doesn't give him the right to go and start drilling to find—to establish probable cause.

He's permitted to make a reasonable inspection, but to the limits that this man went to, I—I suggest that he was—that he went to great length to establish probable cause. He did not have it, initially.

That will be the ruling of the Court.

*Id.* at pp. 12–14.

The district court entered its order granting Carreon's Motion to Suppress on May 17, 1988. The government's Motion to Reconsider the Order Suppressing Evidence was denied on June 14, 1988, as not well taken.

### *Discussion–Disposition*

The warrant requirement of the Fourth Amendment is subject only to a few specifically established and well-delineated exceptions. *Coolidge v. New Hampshire*, 403 U.S. 443, 455, 91 S.Ct. 2022, 2032, 29 L.Ed. 2d 564 (1971); *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). The exceptions to the warrant-based-on-probable cause requirement are anchored to a tripartite weighing of public necessity, efficacy of the search and the degree of the intrusion. *See California v. Greenwood*, 486 U.S. 35, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988) (a warrantless search

and seizure of garbage placed outside of the residential curtilage for collection does not violate the Fourth Amendment because there is no legitimate expectation of privacy in such garbage); *Colorado v. Bertine*, 479 U.S. 367, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987) (police may open closed containers while conducting a routine inventory search of an impounded vehicle); *New Jersey v. T.L.O.*, 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (administrative searches of school children by school officials conducted on school property approved based on *reasonable* grounds for *suspicion* of violation of law or school rules); *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) (random searches without probable cause are permissible in prison since there is no legitimate expectation of privacy in a prison cell); *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (consensual search); *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (stop and frisk for weapons); *Colonnade Catering Corp. v. United States*, 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970) (regulatory-administrative inspection of premises); *Beck v. Ohio*, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964) (search incident to a lawful arrest). And the exception to the Fourth Amendment's warrant requirement we are concerned with in the instant case deals with border searches. In *United States v. Mayer*, 818 F.2d 725, 727 (10th Cir.1987), we observed:

The border search has long been recognized as an exception to the Fourth Amendment's (probable cause) warrant requirement. *Carroll v. United States*, 267 U.S. 132, 154, 45 S.Ct. 280, 285, 69 L.Ed. 543 [1925]. At the border, "the Fourth Amendment balance between the interests of the Government and the privacy right of the individual is struck more favorably to the Government," *United States v. Montoya de Hernandez*, 473 U.S. 531, 540, 105 S.Ct. 3304, 3310, 87 L.Ed.2d 381 [1985], because of the "longstanding right of the sovereign to protect itself by stopping and examining persons and property." *United States v. Ramsey*, 431 U.S. 606, 616, 97

S.Ct. 1972, 1978, 52 L.Ed.2d 617 [1977], and the "longstanding concern for the protection of the integrity of the border." *Montoya de Hernandez*, 473 U.S. at 538, 105 S.Ct. at 3309. Border searches are reasonable within the meaning of the Fourth Amendment because of "the single fact that the person or item in question had entered into our country from outside." *Ramsey*, 431 U.S. at 619, 97 S.Ct. at 1980.

In *United States v. Montoya de Hernandez*, 473 U.S. 531, 537–38, 105 S.Ct. 3304, 3308–09, 87 L.Ed.2d 381 (1985), the Supreme Court pertinently observed:

Here the seizure of the respondent (detained by customs officials for sixteen hours and subjected to rectal examination which resulted in obtaining 88 cocaine-filled balloons smuggled in her alimentary canal) took place at the international border. Since the founding of our Republic, Congress has granted the Executive plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant, in order to regulate the collection of duties and to prevent the introduction of contraband into this country. *See United States v. Ramsey*, 431 U.S. 606, 616–17, 97 S.Ct.1972, 1978–79, 52 L.Ed.2d 617 (1977), citing Act of July 31, 1789, ch. 5, 1 Stat. 29. This Court has long recognized Congress' power to police entrants at the border. *See Boyd v. United States*, 116 U.S. 616, 623, 6 S.Ct. 524, 528, 29 L.Ed. 746 (1886). As we stated recently:

" 'Import restrictions and searches of persons or packages at the national border rest on different considerations and different rules of constitutional law from domestic regulations. The Constitution gives Congress broad comprehensive powers "[t]o regulate Commerce with foreign Nations," Art. I, § 8 cl. 3. Historically, such broad powers have been necessary to prevent smuggling and to prevent prohibited articles from entry.' " *Ramsey, supra*, 431 U.S. at 618–19, 97 S.Ct. at 1980, quoting *United States v. 12 200–Ft. Reels of Film*, 413 U.S. 123, 125,

93 S.Ct. 2665, 2667, 37 L.Ed.2d 500 (1973).

Consistently, therefore, with Congress' power to protect the Nation by stopping and examining persons entering this country, the Fourth Amendment's balance of reasonableness is qualitatively different at the international border than in the interior. Routine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause—or warrant; and first-class mail may be opened without a warrant on less than probable cause, *Ramsey, supra.* Automobile travelers may be stopped at fixed checkpoints near the border without individualized suspicion even if the stop is based largely on ethnicity, *United States v. Martinez–Fuerte,* 428 U.S. 543, 562–63 [96 S.Ct. 3074, 3085, 49 L.Ed.2d 1116] (1976), and boats on inland waters with ready access to the sea may be hailed and boarded with no suspicion whatever. *United States v. Villamonte–Marquez,* [462 U.S. 579, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983) ], *supra.*

These cases reflect longstanding concern for the protection of the integrity of the border. This concern is, if anything, heightened by the veritable national crisis in law enforcement caused by smuggling of illicit narcotics, *see United States v. Mendenhall,* 446 U.S. 544, 561 [100 S.Ct. 1870, 1880, 64 L.Ed.2d 497] (1980) (POWELL, J., concurring), and in particular by the increasing utilization of alimentary canal smuggling. (Footnote omitted).

The *Montoya de Hernandez* Court observed that one presenting herself at the border for admission into the United States is entitled to be free from unreasonable search and seizure but that the Fourth Amendment balance between the interests of the government and the privacy right of the individual is "[a]lso struck much more favorably to the government at the border." The Court held that detention and search beyond the scope of a routine customs inspection may be undertaken based on a "reasonable suspicion" standard justified by a particularized and objective basis for suspecting the particular person of

smuggling contraband. 473 U.S. at 541, 105 S.Ct. at 3310. The Court placed great emphasis upon the fact that "[T]he trained customs inspectors had encountered many alimentary canal smugglers and certainly had more than an 'inchoate and unparticularized suspicion or 'hunch.' *Terry, supra,* 392 U.S. at 27, 88 S.Ct. at 1883, that respondent was smuggling narcotics in her alimentary canal." *Id.,* 473 U.S. at 542, 105 S.Ct. at 3311.

19 U.S.C. § 1582 provides:

The Secretary of the Treasury may prescribe regulations for the search of persons and baggage and he is authorized to employ female inspectors for the examination and search of persons of their own sex; and all persons coming into the United States from foreign countries shall be liable to detention and search by authorized officers or agents of the Government under such regulations.

19 U.S.C. § 482 provides, in pertinent part:

Any of the officers or persons authorized to ... search ... may stop, search, and examine ... within their respective districts, any vehicle, beast or person, on which or whom he or they shall suspect there is merchandise which is subject to duty, or shall have been introduced into the United States in any manner contrary to law, whether by the person in possession or charge, or by, in, or upon such vehicle or beast, or otherwise, and to search any trunk or envelope, wherever found, in which he may have a reasonable cause to suspect there is merchandize which was imported contrary to law; and if such officer or other person so authorized shall find any merchandize ... which he shall have reasonable cause to believe ... to have been unlawfully introduced into the United States ... he shall seize and secure the same for trial.

█ The district court did not conduct an analysis of the undisputed facts to determine whether, based on all of the circumstances, Inspector Gordon held a "reasonable suspicion" to justify extension of his routine border search of Mr. Carreon's

pickup truck by drilling the small hole in the camper wall. Thus, the court did not make findings based on the credibility of witness Inspector Gordon. *See Anderson v. City of Bessemer City,* 470 U.S. 564, 573-75, 105 S.Ct. 1504, 1511-12, 84 L.Ed. 2d 518 (1985). The court concluded, however, "[t]he fact that he (Gordon) claims that he found something that sounded solid rather than hollow, that doesn't give the right to go and start drilling to find ... to establish probable cause." (R., Vol. II, p. 14). The court also concluded that Inspector Gordon "[h]ad nothing to warrant the extreme inspection that he made." *Id.* Insofar as the district court's reasoning, *supra,* constitute findings of fact as distinguished from conclusion of law or vice versa, we must hold that they are clearly erroneous.

When a search and seizure is challenged as violative of the Fourth Amendment, the burden is on the government to prove its validity. *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), *reh'g denied,* 448 U.S. 908, 100 S.Ct. 3051, 65 L.Ed.2d 1138 (1980); *United States v. Gay,* 774 F.2d 368 (10th Cir.1985) (the appellate court must accept the trial court's findings of fact unless they are clearly erroneous; must consider the evidence adduced at the suppression hearing in the light most favorable to the prevailing party); *United States v. Recalde,* 761 F.2d 1448 (10th Cir.1985) (we there placed emphasis on the importance of the testimony given at the suppression hearing by the defendant Recalde, concluding that, based on the undisputed facts, the government had failed to carry its burden of proof); *United States v. Diaz–Albertini,* 772 F.2d 654 (10th Cir.1985), *cert. denied,* —— U.S. ——, 108 S.Ct. 82, 98 L.Ed.2d 45 (1987).

In *United States v. Pappas,* 735 F.2d 1232, 1233 (10th Cir.1984), we pointed to the need for adequate trial court findings following a suppression hearing:

> At a hearing on a motion to suppress, the credibility of the witnesses and the weight to be given the evidence together with the inferences, deductions and conclusions to be drawn from the evidence, are to be determined by the trial judge.... The appellate court is bound by the trial court's determinations unless they are clearly erroneous ... where, as here, there are only conclusory findings, we may look to the judge's statements and ruling from the bench to ascertain the trial court's factual findings and credibility determinations.

Nothing in the record before us discloses any factual findings or credibility determinations by the trial court. The facts, all garnered from the testimony of Inspector Gordon, are undisputed. In our view, those facts and all reasonable inferences, deductions and conclusions to be drawn therefrom lead to the inescapable conclusion that the search and seizure of the marijuana secreted in the camper wall by Inspector Gordon was justified on the "reasonable suspicion" standard articulated in *Montoya de Hernandez, supra.*

Before setting forth our reasoning-analysis, we must observe that we cannot ascertain the trial court's basis for sustaining defense counsel's objection (on general relevancy grounds) to Inspector Gordon's response to the question "[H]ad you discovered in previous searches of other vehicles similar compartments." (R., Vol. II, p. 8). This line of inquiry, we suggest, goes to the heart of the applicable "reasonable suspicion" standard. In light of Inspector Gordon's prior testimony that, in the course of his sixteen and one-half years of service as a customs inspector, he had effected more than five hundred narcotics seizures of the size of the marijuana seized from the Carreon vehicle, Gordon's personal knowledge of secreting of narcotics in "similar compartments" was extremely relevant. See generally, Rule 602, 28 Appendix, Fed.R.Evid.; *United States v. Brown,* 540 F.2d 1048 (10th Cir.), *cert. denied,* 429 U.S. 1100, 97 S.Ct. 1122, 51 L.Ed.2d 549 (1977) (witness may testify upon concrete facts within his own observation and recollection—facts perceived from his own senses). Rule 104(a), 28 Appendix, Fed.R. Evid. provides that with respect to preliminary questions concerning the qualification of a person to be a witness or the admissibility of evidence the court is "[n]ot bound

by the rules of evidence except those with respect to privileges." Again, for some inexplicable reason, the court granted defense counsel's motion to strike that portion of the government's closing argument relative to Inspector Gordon's suspicions concerning the bottom, solid portion of the camper wall and his determination to search further by means of the electric drill. That argument, too, was directed specifically at the "reasonable suspicion" standard.

In our view, the facts of this case did establish a "reasonable suspicion" justifying Inspector Gordon's search of the bottom portion of Carreon's camper wall by use of the electric drill.

■ (1) Inspector Gordon's inspection of the Carreon vehicle, documents and belongings, the subsequent "pat down" of the female passenger and the detention of Carreon while Gordon went for his electric drill were all reasonable, routine border search procedures. *See United States v. Montoya de Hernandez, supra* (16 hour detention); *United States v. Sandler*, 644 F.2d 1163 (5th Cir., En Banc, 1981) (mere suspicion is sufficient to justify a pat down at the border, as part of a routine border inspection); *United States v. Wilmot*, 563 F.2d 1298 (9th Cir.1977) (pat down search is part of routine border search); *United States v. Nieves*, 609 F.2d 642 (2nd Cir. 1979), *cert. denied*, 444 U.S. 1085, 100 S.Ct. 1044, 62 L.Ed.2d 771 (1980) (search of a defendant's shoes for narcotics was an acceptable routine border inspection procedure). *See also United States v. Ramsey*, 431 U.S. 606, 616, 97 S.Ct. 1972, 1978, 52 L.Ed.2d 617 (1977) (searches of persons or vehicles and contents crossing international boundaries "[a]re reasonable simply by virtue of the fact that they occurred at the border."); *United States v. Vega–Barvo*, 729 F.2d 1341, 1345 (11th Cir.), *cert. denied*, 469 U.S. 1088, 105 S.Ct. 597, 83 L.Ed. 2d 706 (1984) ("Both a luggage search and a pat down or frisk fall within this category [routine border searches].... A person's decision to cross our national boundary is justification enough for such a search."); *United States v. Carter*, 592

F.2d 402 (7th Cir.), *cert. denied*, 441 U.S. 908, 99 S.Ct. 2001, 60 L.Ed.2d 378 (1979) (inspections and searches of individuals, their belonging and effects as they seek to cross border or their functional equivalents are routine searches not subject to the warrant requirements of the Fourth Amendment); *United States v. Fitzgibbon*, 576 F.2d 279 (10th Cir.), *cert. denied*, 439 U.S. 910, 99 S.Ct. 279, 58 L.Ed.2d 256 (1978); *United States v. Chase*, 503 F.2d 571 (9th Cir.1974), *cert. denied*, 420 U.S. 948, 95 S.Ct. 1332, 43 L.Ed.2d 427 (1975).

(2) Inspector Gordon testified that Mr. Carreon was nervous (he looked away when he spoke and was evasive in his responses to questions) and when he (Carreon) handed certain documents to him (Gordon), he was shaking. It has been held that a more intrusive search (beyond a routine border search), including a strip search, is justifiable if a person behaves in an articulably suspicious manner. *United States v. Carter*, 590 F.2d 138 (5th Cir.), *cert. denied*, 441 U.S. 908, 99 S.Ct. 2001, 60 L.Ed.2d 378 (1979) (extreme nervousness and anxiety during questioning); *United States v. Asbury*, 586 F.2d 973 (2nd Cir. 1978) (excessive nervousness, evasive answers factors justifying strip search); *United States v. Himmelwright*, 551 F.2d 991 (5th Cir.), *cert. denied*, 434 U.S. 902, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977) (defendant gave evasive and contradictory answers to custom inspector's questions justifying decision to search her exterior body surface); *United States v. Maggard*, 451 F.2d 502 (5th Cir.), *cert. denied*, 405 U.S. 1045, 92 S.Ct. 1330, 31 L.Ed.2d 587 (1972) (reasonable suspicion for vehicle search based upon defendant's nervousness and suspicious behavior); *United States v. Faulkner*, 547 F.2d 870 (5th Cir.1977) (driver of vehicle acted in nervous and agitated manner); *United States v. Nichols*, 560 F.2d 1227 (5th Cir.1977) (defendant's nervousness significant factor); *United States v. Smith*, 557 F.2d 1206 (5th Cir.), *cert. denied*, 434 U.S. 1073, 98 S.Ct. 1259, 55 L.Ed. 2d 777 (1978) (defendant acted "very, very nervous," was pale and appeared to be sick, fitting a smuggling profile); *United States v. Glaziou*, 402 F.2d 8 (2nd Cir.), *cert.*

*denied,* 393 U.S. 1121, 89 S.Ct. 999, 22 L.Ed.2d 126 (1969) (when defendants were stopped they appeared to be extremely nervous and this heightened the customs officers' suspicions).

(3) During the course of his routine inspection of the pickup truck and camper, Inspector Gordon observed that the camper shell had been recently removed because the six nuts on the bolts, three on each side, with two in the front, which hold the camper shell onto the truck "[h]ad a little shiny part of each nut—the bottom nut. This tells you that them nuts had been off recently." (R., Vol. II, p. 2). Gordon also then observed that the front part of the camper shell was very thick and wide, covered with plywood. Entering the camper with a coathanger, Gordon determined that the top part of the thick compartment was hollow. He then thumped the bottom part of the compartment with the coathanger and determined that "[i]t was solid as a rock." *Id.* Gordon then decided to search inside the enclosed compartment by means of his electric drill. It was in relation to this testimony that the trial court sustained an objection, on relevancy grounds, to this question posed to Gordon by the prosecutor: "Q. Had you discovered in previous searches of other vehicles similar compartments?" *Id.* at 8.

Inspector Gordon was well aware that the Republic of Mexico, from which the Carreon vehicle had arrived, is a source country for drugs. The thickness of the front portion of the camper wall, the shiny nuts, the hollowness of the upper portion of the camper wall compartment as compared to the "solid as a rock" aspect of the lower portion of the compartment—coupled with Mr. Carreon's nervousness and shaking—did create the "reasonable suspicion" justified on a particularized and objective basis required by *United States v. Montoya de Hernandez,* 473 U.S. at 541, 105 S.Ct. at 3310. The Supreme Court, in *United States v. Cortez,* 449 U.S. 411, 419, 101 S.Ct. 690, 696, 66 L.Ed.2d 621 (1981), *reh'g denied,* 455 U.S. 1008, 102 S.Ct. 1648, 71 L.Ed.2d 877 (1982), said that in assessing the concept of "cause" justifying border patrol officers to effect an investiga-

tive stop of a vehicle away from the border, the totality of the circumstances—the whole picture—must be taken into account:

It implicates all of the principles just discussed—especially the imperative of recognizing that, when used by trained law enforcement officers, objective facts, meaningless to the untrained, can be combined with permissible deductions from such facts to form a legitimate basis for suspicion of a particular person and for action on that suspicion. We see here the kind of police work often suggested by judges and scholars as examples of appropriate and reasonable means of law enforcement. Here, fact on fact and clue on clue afforded a basis for the deductions and inferences that brought the officers to focus on 'Chevron.'

In *United States v. Puig,* 810 F.2d 1085 (11th Cir.1987), a customs officer seized approximately 317 kilograms of cocaine hidden in a secret compartment in the bulkhead of a boat, discovered only after the officer drilled holes in it. The court held that the intrusion was reasonable:

Here, Officer LeGasse initially boarded and conducted an unintrusive visual inspection of the boat. This visual inspection revealed a number of factors which were inconsistent with the 'fishing trip' story given by the defendants and which raised a reasonable suspicion based on Officer LeGasse's experience that illegal contraband was hidden in the unaccounted for section beyond the forward bulkhead. It was thus reasonable for the agent to undertake a more thorough search....

\*     \*     \*     \*     \*     \*

Appellants emphasize the intrusiveness of LeGasse's drilling into the plywood section of the hull, decrying "the permanent physical destruction of an integral part of the vessel" ... yet this surely overstates the damage wrought by a small hole that could easily be plugged and repaired. The government must be permitted to take such limited steps when it has established a reason-

**1444**

able suspicion of illegal activity. (Footnote omitted).

In *United States v. Moreno*, 778 F.2d 719 (11th Cir.1985), customs officials boarded a vessel which was on the customs' "lookout list" of vessels suspected of being involved in narcotics smuggling. Upon boarding the vessel, the officers learned that the ship had entered the United States (Miami River) from foreign waters. Customs Officer Herm arrived at the scene and advised the other agents that from a previous boarding of this vessel, he knew that the ship contained concealed compartments. Agents then drilled a second hole into another portion of the fuel tanks. A probe inserted into this hole indicated that some solid objects—rather than fuel—occupied this portion of the tank. The agents then used an electric saw to gain access to the concealed compartment and thereupon discovered numerous bales of marijuana. The court held that this search and seizure was particularly justified since one of the customs agents recalled from a previous boarding that the ship contained the secret compartments.

In the instant case, we have previously observed that Officer Gordon discovered the secret compartment during a routine border inspection.

Finally, in *United States v. Faulkner*, 547 F.2d 870 (5th Cir.1977), the border patrol's search and seizure of 450 pounds of marijuana concealed in a pickup truck with an attached camper was challenged as violative of the Fourth Amendment. In that case, contact was not made at the border but instead at a permanent checkpoint within the United States so that a heightened standard of probable cause was applied, rather than the reasonable suspicion standard, which applies here. Even so, the court observed/held:

> [A] search at a permanent checkpoint is valid if, after stopping the vehicle, the Border Patrol agent finds probable cause to make the search. *United States v. Ortiz*, 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975). *The incongruity in the camper's structure (the inside ceiling was approximately one foot lower than the outside ceiling) and the Border Patrol agent's knowledge that this was a common means of transporting contraband, coupled with the initial attempt of defendant to drive through the checkpoint and his nervous and agitated behavior, furnished reasonable justification for referring defendant's vehicle to a secondary inspection point for further investigation* (emphasis supplied).

We hold that the order of the district court granting the Motion to Suppress was clearly erroneous. That Order is REVERSED and the case is REMANDED for trial.