BRUNETTI, Circuit Judge,
concurring in the result:

FACTS

On September 10, 1999, at approximately 3:36 a.m., Jose Molina-Tarazon entered the Calexico West Port of Entry. He was the sole occupant of a 1991 Dodge Dakota pickup truck. He was met by U.S. Customs Inspector George Volz. Inspector Volz initially became suspicious because Molina Tarazón was wearing a brand new hat perched on top of his head “like he was afraid to mess up his hair”, and also wearing black horn-rimmed glasses. Inspector Volz explained that prior experience working the pedestrian lanes, where mainly farm-workers enter, led him to suspect Molina Tarazón was impersonating a U.S. citizen. This led Inspector Volz to doubt Molina-Tarazon’s declaration that he was a United States citizen, and to further inspect the vehicle for signs of smuggling.
After an inspection of the gas tank, Inspector Volz’ suspicions were further heightened by the fact that the mud appeared to be artificially applied, rather than accumulated through normal wear. Specifically, although the top of the tank was dirty and there was mud behind the bolts that held the tank, the sensing unit was not dirty. Inspector Volz further noted that the gas tank hoses appeared new. At this point, Volz referred Molina-Tara-zon to further inspection.
At the secondary inspection area, Molina-Tarazon was met by U.S. Customs Inspector Kevin Brown. Molina-Tarazon stated that the truck belonged to his wife. The truck was then inspected by a canine unit which failed to alert for drugs. Inspector Brown used a mirror to inspect the truck’s gas tank. Brown also tried to insert a fiberoptic scope into the gas tank, but was unsuccessful because of a blockage. Brown then crawled underneath the tank to conduct a physical inspection. He observed what he believed to be signs that the “sending unit and/or pump unit had been off recently.” Brown noted that the mud on the gas tank did not appear consistent with the bottom chassis of the truck and that the pump unit was basically clean. This entire inspection lasted 10-12 minutes. At that point, Brown called a local contracting mechanic to come and remove the gas tank on site. It took approximately 15-20 minutes for the mechanic to arrive.
According to Inspector Brown, the removal of the gas tank involves: putting the truck on a mechanical lift, disconnecting the filler hose, the hose going to the engine and the corresponding electrical connections, and loosening the straps that hold the tank to the chassis. Neither a torch nor hacksaw was used, and the gas tank can be reattached without causing any damage. It took approximately 10-15 minutes to remove the gas tank. Drugs were ultimately recovered from the gas tank.

SPECIAL CONCURRENCE

I concur in the majority’s opinion to the extent that vehicular border searches could conceivably be conducted in a manner so intrusive as to render the search non-routine. When such searches occur, a *719 reasonable suspicion on the part of law enforcement is required. I also concur in the result as I believe the Customs Inspectors had a reasonable suspicion to justify this search no matter what its category.
I am unable, however, to concur in the analysis in Part III of the opinion because I believe it goes too far. There is a very real distinction between the removal or disassembly of part of an automobile in the ordinary course of inspection, and the application of destructive force in order to facilitate inspection. See United States v. Carreon, 872 F.2d 1436 (10th Cir.1989) (drilling into camper required reasonable suspicion); United States v. Rivas, 157 F.3d 364 (5th Cir.1998) (drilling into body of trailer was not routine search and required reasonable suspicion); United States v. Robles, 45 F.3d 1 (1st Cir.1995) (drilling into machine part required reasonable suspicion).
The search at issue here is an example of the simple disassembly of a gas tank in the ordinary course of inspection. As the district court pointed out:
The intrusion here was not great. Nothing was broken. Some bolts
were unscrewed, and the tank was lowered. There wasn’t any connection from the tank to the vehicle that was broken, it was just straps that held it in place, so it could be restrapped back. It is not like it is bonded or glassed or welded in place where they had to break the welds. Two hoses were removed, the filler hose and the sending hose, and the tank was lowered and the cap was unscrewed, and there was the marijuana.
This inspection was conducted in a matter of 10-15 minutes with no permanent alteration or resulting harm to Molina-Tara-zon’s vehicle.
The majority’s opinion seizes on the use of tools and employment of a mechanic to “raise the inference that this was not a routine search.” Such a finding labels any routine dismantlement by a mechanic, from the removal of fender to bumper, a non-routine inspection. As discussed above, the use of force that somehow alters or damages the vehicle is far more intrusive than the simple disassembly and reassembly that occurred here. The majority opinion also focuses on the inherent psychological fear that stems from the possibility that a mechanic not of the detainee’s choosing may fail to reassemble the vehicle in a safe and reliable manner. The risk of negligent reassembly or replacement may create fear that would never be overcome in any circumstances, including the simplest dismantlement.
For these reasons, I cannot concur in the analysis in Part III of this opinion.