# In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 02-2184

KATHRYN KANIFF,

*Plaintiff-Appellant*,

v.

UNITED STATES OF AMERICA,

*Defendant-Appellee.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 3882—**Rebecca R. Pallmeyer**, *Judge.*

_____

ARGUED FEBRUARY 18, 2003—DECIDED DECEMBER 11, 2003

_____

Before RIPPLE, DIANE P. WOOD, and EVANS, *Circuit Judges.*

DIANE P. WOOD, *Circuit Judge.* Kathryn Kaniff was singled out for further inspection as a suspected drug smuggler at O'Hare International Airport when she returned from a four-day trip to Jamaica over the Christmas holiday in 1997. After a pat-down search, a visual inspection of her body cavities, and an x-ray of Kaniff's abdomen failed to yield evidence of contraband, Customs officials allowed her to leave the airport. Understandably distressed

by her ordeal, Kaniff sued the inspectors in their individual capacities, alleging common law tort and constitutional violations. The court later substituted the United States as the defendant, and Kaniff dismissed her suit against the individual officers with prejudice. After a full trial, an advisory jury recommended judgment in Kaniff's favor. The district judge, however, disagreed with the recommendation and entered judgment for the United States. Kaniff now appeals. We affirm, in essence because the Customs officials had sufficient grounds for their actions, even though their suspicions ultimately proved to be unfounded.

**I**

As she had done for several years, Kaniff traveled to Jamaica for a four-day vacation over the Christmas holiday. She paid for her plane ticket in cash, and the price she paid was higher than it might have been because she made her arrangements less than two weeks before the trip. Notwithstanding the latter fact, the price was not considerably greater than she had paid for the same trip in years past. For lodgings, she chose to camp at the Silver Point Resort in Negril, as she had done on all but one of her prior trips to Jamaica. The "resort" is actually a modest campground and several rustic cabins located in the owner's backyard.

Before Kaniff's return flight to Chicago, the U.S. Customs Service Passenger Analysis Unit (PAU) reviewed information about her. The PAU is responsible for screening incoming passengers for indicia of possible drug smuggling. In Kaniff's case, this review prompted Customs inspectors at O'Hare to pre-select her for further questioning upon her arrival. It did so for a number of reasons. At trial, Guadalupe Whyte (at the time Guadalupe Corona), the Customs inspector who was working in the PAU and who created a "lookout" in the Customs database for Kaniff,

testified that the red flags were raised because Kaniff was traveling from Jamaica, a known narcotics source country from which drug traffickers frequently smuggle drugs using body cavities, and because Kaniff was returning after a short trip. In addition, after the government was permitted to show Whyte a printout of the computer screens that she had consulted when she ran the computer check in the PAU, Whyte recalled that she would also have considered the fact that narcotics arrests had been made at Kaniff's address and the fact that Kaniff had been referred for a secondary Customs examination (that yielded no evidence of contraband) upon her return from an earlier trip to Jamaica. With the "lookout" in the computer, Kaniff was immediately singled out for special treatment when she deplaned at O'Hare. She was routed to a secondary inspection area after a trained dog independently alerted to the odor of narcotics from her person or from a box that she was carrying (when Kaniff walked down the jet-way past the dog, he pulled away from his handler, began to "work the air" behind Kaniff trying to trace the source of the scent of narcotics he detected, and eventually circled her body before hitting a box that she was carrying with his nose).

After the dog alert (which Kaniff has challenged, as we discuss below), Customs inspector Olga Martinez took Kaniff to the Customs inspection area to ask her some questions and to inspect her luggage and the box. Although a search of Kaniff's luggage and the box did not yield any contraband, Martinez was unsatisfied with Kaniff's answers to several questions. She accordingly sought and obtained permission from her supervisor, Mark Woods, to subject Kaniff to a pat-down search. Kaniff complains about the questioning process itself, claiming that Martinez repeatedly cut her off and did not allow her to give complete answers to questions about the details of her trip to Jamaica, her income and employment.

The pat-down search took place in a private room with Customs inspector Whyte observing Martinez's work. Claiming to have felt a thickness in Kaniff's crotch, Martinez asked Kaniff if she was wearing a sanitary pad or menstruating; Kaniff answered no to both questions. Martinez, now concerned that Kaniff may have hidden contraband in her pants or a body cavity, consulted a second time with Woods. She obtained permission to conduct a partial strip search during which Kaniff was told to lower her pants and underpants so that both could be inspected, and to spread her legs and buttocks with her hands so that inspector Martinez could visually inspect her anus. There was still no sign of contraband, and so Martinez consulted her supervisor once again. This time they were joined by inspector Whyte, and the three discussed all known information about Kaniff. That information included a number of facts that appeared suspicious, including the fact that heroin was seized from an apartment in the building in which she had lived the prior year, the dog alert to narcotics odor from Kaniff or her possessions, Kaniff's responses to various questions, an inconsistency between her driver's license address (in Wisconsin) and the address that she gave the Customs inspectors (in Illinois), and her last minute and unusual travel arrangements, including the fact that she told the inspectors that she was going to page a friend to pick her up at the airport, but that she did not know exactly where this friend lived.

Concerned that Kaniff might be an "internal" drug smuggler (that is, someone who conceals the drugs somewhere inside her body), Woods advised her that she could: (1) wait and pass a bowel movement naturally; (2) take a laxative and wait to pass a bowel movement; or (3) consent to an x-ray. All three options involved a trip to a nearby hospital because it is Customs policy to take individuals suspected of smuggling drugs by ingesting them to a med-

ical facility in case the package in which the drugs are sealed ruptures and leaks internally before the drugs are passed (a possibility that could be lethal). Woods also explained to Kaniff that if she chose to wait or refused to consent to an x-ray, Customs could seek a warrant to require her to have an x-ray. Kaniff then apparently signed a consent form, although the evidence of her consent was not as clear as it might have been. The government could not produce the original signed form, because it was lost or destroyed. Instead, it offered a copy that it had obtained from the hospital. The reproduced copy of the form contained Martinez's and Whyte's signatures, but Kaniff's signature was not visible because the copy was poor. After hearing testimony from Kaniff, Woods, Whyte and Martinez, the district court concluded that Woods credibly testified that he informed Kaniff of her right to refuse to consent to the x-ray and that Kaniff knowingly and voluntarily signed the consent form and thus agreed to submit to the procedure.

Before taking Kaniff to a nearby hospital for the x-ray, Woods obtained permission to take this step from the Chief Customs inspector at O'Hare Airport. The Chief Customs inspector agreed that there were reasonable grounds to suspect Kaniff of internally smuggling narcotics. Kaniff was then handcuffed and taken by Woods, Martinez and Whyte to Resurrection Medical Center. The hospital was given a copy of Kaniff's signed consent form and, as was its policy, required her to take a pregnancy test before administering the x-ray. The pregnancy test necessitated a urine sample, which Kaniff was required to produce in the presence of inspectors Martinez and Whyte to ensure that contraband was not destroyed or lost in the process. After the pregnancy test came back negative, Kaniff's abdomen was x-rayed. The x-ray revealed no contraband. Her ordeal over, Kaniff was taken back to O'Hare, allowed to retrieve her belongings, and released.

In June 1999, Kaniff filed a *Bivens* lawsuit against several named Customs inspectors alleging violation of various constitutional rights. She amended the suit to add supervisor Woods and several common law tort claims, including intentional infliction of emotional distress, false imprisonment, assault and battery. The United States moved to be substituted as the defendant for the tort counts, and the named defendants filed a motion for summary judgment asserting qualified immunity as a defense. The defendants' motion was denied and then reinstated by the district court upon the defendants' motion for reconsideration. Before the district court could rule on the motion for summary judgment, the parties agreed to dismiss the claims against the individual defendants with prejudice, and to proceed before an advisory jury against the United States alone on the non-constitutional tort claims under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671 *et seq.* See also FED. R. CIV. P. 39(c). Following a full trial, as we have noted, the advisory jury found for Kaniff. The district court evaluated the case differently and entered judgment for the United States.

## II

O'Hare Airport is a major international port of entry into the United States. At all such entry points, Customs officials are entitled to conduct routine questioning and examination of luggage, without any particular level of suspicion. *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985); *United States v. Yang*, 286 F.3d 940, 944 (7th Cir. 2002); *United States v. Johnson*, 991 F.2d 1287, 1290-92 (7th Cir. 1993). In Kaniff's case, however, certain facts about Kaniff had raised enough concern for the first round of supplemental questioning, and during that process, inspector Martinez grew concerned about some of

the answers that Kaniff gave. The issues before us relate to the escalating levels of intrusion that took place thereafter.

The first additional step that inspector Martinez took was to conduct a pat-down search, after the inspector asked for permission to do so and her supervisor approved. There is some uncertainty over whether a pat-down search is a non-routine border search that must be justified by some quantum of suspicion—reasonable suspicion or less. The Third Circuit has recently taken the position that a pat-down search at a U.S. border is a routine border search that requires no suspicion at all. In doing so, it joined a long line of decisions that have reached the same result. *Bradley v. United States*, 299 F.3d 197, 203 (3d Cir. 2002); accord *United States v. Beras*, 183 F.3d 22, 26 (1st Cir. 1999); *United States v. Gonzalez-Rincon*, 36 F.3d 859, 864 (9th Cir. 1994); *United States v. Carreon*, 872 F.2d 1436, 1442 (10th Cir. 1989); *United States v. Oyekan*, 786 F.2d 832, 835 (8th Cir. 1986). See also *United States v. Flores-Montano*, No. 02-50306 (9th Cir. Mar. 14, 2003), *petition for cert. filed*, 71 U.S.L.W. 3791 (U.S. June 11, 2003) (No. 02-1794) (seeking review of question whether Customs officials at international border must have reasonable suspicion to remove, disassemble, and search vehicle fuel tank for contraband). In the past, this court has suggested that a pat-down search at the border lies somewhere between routine questioning and luggage inspection, which requires no suspicion, and a strip search, which must be supported by reasonable suspicion. *United States v. Dorsey*, 641 F.2d 1213, 1218 (7th Cir. 1981). Later cases have not squarely addressed the level of suspicion that is required to justify a pat-down search. See, *e.g.*, *Johnson*, 991 F.2d at 1291-92 (discussing routine and non-routine border searches); *Saffell v. Crews*, 183 F.3d 655, 657-59 (7th Cir. 1999) (finding ample justification to support strip search without explaining quantum of suspicion required to conduct initial pat-down

search). This case does not require us to reconsider our holding in *Dorsey* and decide whether any suspicion is required to support a pat-down search at a U.S. border, because we agree with the district court that the reasonable suspicion existed here. Kaniff, of course, disagrees.

## A

By now it is axiomatic that a district court's finding of reasonable suspicion is subject to plenary review, although we defer to the district court's findings of historical fact, reversing only on a showing of clear error. *Ornelas v. United States*, 517 U.S. 690 (1996); *United States v. Harris*, 281 F.3d 667, 670 (7th Cir. 2002). This standard of review requires us to parse the district court's ruling carefully, separating the fact findings, including credibility determinations, from the applications of fact to law. It is the former to which we owe deference, while the latter are subject to *de novo* review. *Ornelas*, 517 U.S. at 696-97; *Harris*, 281 F.3d at 670.

In finding reasonable suspicion to justify the pat-down search, the district court correctly considered all of the facts that were known to inspector Martinez at the time she sought permission to conduct the search. *United States v. Arvizu*, 534 U.S. 266, 274 (2002); *Montoya de Hernandez*, 473 U.S. at 541. As the Supreme Court has explained, reasonable suspicion requires "a particularized and objective basis for suspecting the particular person" of concealing contraband. *Montoya de Hernandez*, 473 U.S. at 541-42 (internal quotation marks and citations omitted). Those facts included the particularized, objective information we described above: the premium fare for the ticket; the use of cash for the purchase; equivocal answers to several of Martinez's questions about where she stayed and how, on an annual income of $9,000 to $11,000, she could afford the

trip; and the disparity between her Illinois home address and the Wisconsin address on her driver's license.

In response, Kaniff notes that several of these factors, when considered in isolation, are consistent with the characteristics and behavior of innocent travelers. We agree with this general observation, but it is not enough to carry the day for Kaniff. For example, it does not strike us as particularly suspicious that Kaniff's driver's license listed a Wisconsin address yet she gave the airline an Illinois home address. In our mobile society, people move around frequently, and Kaniff might have changed residences between the time her driver's license was issued and her airline tickets were purchased, or she might simply have been slow to bring her driver's license up-to-date. But taking all the circumstances that were before the customs inspectors together, as we must, we have no trouble concluding that they created a reasonable suspicion that Kaniff might have been smuggling drugs. See, *e.g.*, *Arvizu*, 534 U.S. at 273, 275-76. Far more was before the court than was found in the case of *Reid v. Georgia*, 448 U.S. 438 (1980) (*per curiam*), on which Kaniff relies. In *Reid*, two travelers were stopped for questioning on the basis of nothing more than an-over-the-shoulder glance between them and the fact that they were carrying matching carry-on luggage. 448 U.S. at 439. This, according to the Court, was "simply too slender a reed to support the seizure in this case," because the circumstances "describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures" were the government's position embraced. *Id.* at 441. The objective facts pointing to a reasonable suspicion in Kaniff's case far exceed those in *Reid*.

In another effort to undermine the district court's reasonable suspicion finding, Kaniff also challenges several of its fact findings and evidentiary rulings. Yet in doing so she has not shown anything to justify finding clear error

or an abuse of discretion in the presentation of the evidence. Instead, she simply re-argues points that she raised and lost in the district court. For example, she insists that the so-called suspicious answers that she gave to inspector Martinez appeared suspicious only because Martinez would not let her finish her answers to the questions. Kaniff made this same argument in the district court, even though inspector Martinez testified that she allowed Kaniff to provide complete responses to her questions. The district court appears to have credited Martinez's testimony because it found Kaniff's suspicious answers were one of several factors upon which the Customs inspectors relied to form their suspicion that she was smuggling drugs. This is a straightforward credibility question, and we cannot say that the district court's decision to credit Martinez's account over Kaniff's was clearly erroneous. *United States v. Carrasco*, 887 F.2d 794, 819 (7th Cir. 1989) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985)).

Likewise, Kaniff offers no basis on which we could find clear error in the district court's finding that a trained narcotics dog alerted to the odor of narcotics from Kaniff's person or the box she was carrying. The trial transcripts fully support the conclusion that the dog alerted to an odor of narcotics that was somewhere between his nose, Kaniff's body, and the box that she was carrying. Upon further questioning by the district court, the dog handler testified that he did not allow the dog to finish his alert by sitting down because the handler was not in a position immediately to verify the source of the narcotics odor and did not want to reward the dog for a potential false alert. The district court, however, found nothing equivocal in the dog's alert, which it was entitled to do based on this testimony.

Finally, Kaniff attacks the court's decision to allow the government to refresh inspectors Whyte's and Woods's recollection of the fact that during the creation of the PAU

lookout, inspector Whyte learned of narcotics arrests at Kaniff's Chicago address. Kaniff believes that she was sand-bagged by the government's last minute reliance on a screen-by-screen computer playback that documented each screen inspector Whyte looked at in developing the PAU lookout. This information came to light in a rather unusual way. Although during discovery Kaniff sought disclosure of any underlying documentation in this case, the government did not turn over the playback records because it had not yet created these documents. The district court noted that Kaniff's request for electronic records would have included such records. It expressed great concern over the government's last minute reliance on these documents to introduce the very damaging fact that the Customs inspectors were aware that Kaniff lived in a building in which drug arrests had occurred. Nevertheless, the district court ruled that the records could be used to refresh the inspectors' recollection of what information Whyte accessed prior to creating the PAU lookout; it did not allow the government to introduce the playback screens into evidence. We must decide whether this decision was an abuse of the court's discretion.

Inspectors Whyte and Woods both testified (after having an opportunity to view the computer playback) that they considered the fact that Kaniff lived in a building in which drug arrests had occurred in assessing the totality of circumstances to support their suspicion that Kaniff was smuggling drugs. The fact that inspector Martinez expressly testified that she did not consider the PAU lookout in forming a suspicion about Kaniff does not mean that this information was irrelevant. To the contrary, the inspectors consulted one another before seeking Kaniff's consent to submit to an x-ray, and thus it was their collective knowledge that mattered. The information about the building was relevant to their belief that Kaniff may have been smuggling drugs even though the mere fact of unre-

lated drug arrests in the building alone would have been insufficient to support the inspectors' suspicions.

Although the last-minute notice in this case made it very difficult for Kaniff to respond to the government's computer records, the government provided adequate justification for the timing of its disclosure. Kaniff intended to challenge the accuracy of the PAU record (known as a TECS II, Treasury Enforcement Communication System report), which was the only contemporaneous document that the government revealed during discovery in this case. She sought to introduce testimony from a former Customs Service employee who was prepared to testify that he believed the record may have been tampered with as late as six months after the incident. In order to rebuff this line of argument, the government decided to review the computer screens that Whyte had accessed from the Customs Service Internal Affairs Division. This review demonstrated that the computer records had not been altered in a substantive way. The government insists that it notified Kaniff's lawyers that it had created a playback of the computer screens and that the printout was available for review. Kaniff's lawyers denied ever receiving notification of the creation of the playback. In any event, the relevance of the printouts of the computer screens did not become apparent to the government until well into trial when its lawyers were preparing Brian Yates, the dog handler, for his trial testimony. It was Yates who first recalled that the customs inspectors discussed the fact that narcotics arrests had occurred at Kaniff's building. In order to verify Yates's recollection, the government turned to the playback records. The computer records indeed reflected the fact that inspector Whyte had accessed a screen that indicated the narcotics arrest.

We agree with the government that this set of circumstances is devoid of any evidence of intentional sandbagging. Nor does Kaniff suggest that the computer records are

in any way inaccurate. Although we find it troubling that inspectors Martinez, Whyte, and Woods did not independently recall in their depositions and trial testimony the fact that inspector Whyte learned of the narcotics arrest and that this information was relied on in deciding to subject Kaniff to an x-ray, the district court conducted a lengthy, in-chambers discussion with the parties on this issue and ultimately allowed the computer records to be used to refresh inspectors Whyte's and Woods's memories. This decision was not so far out-of-bounds as to be an abuse of the court's discretion. And even if we were to find that the district court abused its discretion in allowing the government to refresh its witnesses' memories, any such error is harmless in light of all the other information that the district court had to support its conclusion that the pat-down search was supported by a reasonable suspicion of drug smuggling. *United States v. McCarthur*, 6 F.3d 1270, 1280 (7th Cir. 1993).

**B**

Next Kaniff attacks the district court's conclusion that the humiliating partial strip search was supported by reasonable suspicion. But the very same reasonable suspicion that supported the pat-down search was enough to justify this additional step, unpleasant though it may have been. In seeking approval to conduct a partial strip search, inspector Martinez had an additional factor to justify the search: she thought that she felt something hard in Kaniff's crotch during the pat-down search. When Kaniff indicated that she was neither menstruating nor wearing a sanitary pad, inspector Martinez had ample justification—especially in light of everything else that she knew about Kaniff's unusual circumstances and travel plans—to support the partial strip search. See *Safell*, 183 F.3d at 657 (finding ample support for pat-down search following drug

dog's detection of narcotics odor and reasonable suspicion for partial strip search after customs inspector felt bulge on passenger).

Seizing upon language in the district court's opinion that expresses skepticism over what inspector Martinez may have felt in Kaniff's crotch while conducting the pat-down search, Kaniff insists that the district court improperly deferred to Martinez's testimony even though it believed she was lying. The entirety of the district court's remarks, however, indicate that the court ultimately decided to credit Martinez's account. Initially, as Kaniff is quick to point out, the district court expressed doubt over exactly what it was that Martinez may have felt through Kaniff's thin blue jeans. Notwithstanding its doubts, however, the court saw no indication of ill motive on Martinez's part nor did it have any other reason to suspect her of lying, and thus it concluded that Martinez had testified truthfully about her perceptions at the time. This is not a case in which the court credited wholly improbable testimony. *United States v. Dillon*, 150 F.3d 754, 758 (7th Cir. 1998) ("We defer to a district court's credibility determinations unless the district judge has chosen to credit *exceedingly* improbable testimony.") (internal quotation marks and citation omitted). Nor did the court simply defer to Martinez's testimony because it was unwilling to second-guess the assessment of a Customs inspector. The latter position, of course, would be unjustified. Law enforcement officers, by their mere position, are not necessarily more credible than other witnesses when they testify as fact witnesses. *Cf., United States v. Amerson*, 938 F.2d 116, 118 (8th Cir. 1991) (finding "district court has a responsibility to ensure the jurors are not predisposed to believe the testimony of the officers is inherently more credible than that of other witnesses"). But by finding a lack of bad faith on Martinez's part, and more importantly, by not expressly finding that Martinez lied when she testified that she felt something

hard in Kaniff's crotch during the pat-down search, the court made the type of credibility determination that is entitled to deference on review. *Dillon*, 150 F.3d at 758.

Finally, Kaniff advances the theory that the inspectors needed to obtain additional (that is, incremental) suspicious evidence at each level of the increasingly invasive searches that they conducted in order to justify searching further (and more intrusively) for contraband. Kaniff cites no authority in support of this position. We asked Kaniff's lawyer at oral argument whether she knew of any Supreme Court decision that announced such a rule, and she could not name one. This is not surprising. A rule that requires additional suspicious details or facts at each level of a search before further, more invasive searching may occur, is problematic for at least two reasons: it would reward criminals who creatively conceal contraband in various ways, and it would create strong incentive for law enforcement personnel to jump to the most invasive techniques in their arsenal at the first opportunity.

## C

Turning to the abdominal x-ray, Kaniff insists that she did not voluntarily consent to an x-ray because any consent that she may have given was in response to a claim of law enforcement authority to obtain a warrant and compel her to submit to an x-ray, and thus was not freely and voluntarily given. The district court first found that Kaniff consented, and then it held that her consent was freely and voluntarily given. Both questions—whether Kaniff consented, and if so, whether her consent was voluntary—are factual questions that are reviewed for clear error. *United States v. Pedroza*, 269 F.3d 821, 829 (7th Cir. 2001). (No one has argued that the particular x-ray procedure here was not an intrusive search methodology. In some instances, such as the routine x-raying of bag-

gage, x-rays have become a routine feature of modern life. In others, such as hospital-based x-rays of the body, the procedure as a whole may be considered invasive. Given the parties' focus on the voluntariness of Kaniff's consent, which would save even an invasive x-ray, we have no need to explore the question whether all x-rays should be subject to the same rule, and if so, which one.)

There was some disagreement at trial over whether Kaniff really did consent to the x-ray. The district court noted that Kaniff all but conceded to having consented on cross-examination when she admitted that she signed a document that she understood meant that she could be taken to the hospital for an x-ray. The conspicuous absence from the record of a consent form with Kaniff's signature makes it harder—but not impossible—to prove consent. Based on the copy of the form and the testimony it heard, the district court was satisfied that Kaniff consented to an x-ray and that the lack of a legible copy was not the result of any wrongdoing. Kaniff has not provided any basis on which to find the district court's initial finding of consent clearly erroneous. Instead, she focuses on the nature of her consent, arguing that the district court improperly shifted the burden to her to prove that her consent was not knowing and voluntary. This raises a legal question— which party bears the burden of proving the voluntariness of consent in a civil case—and we have already held that the burden is on the plaintiff in civil cases. *Valance v. Wisel*, 110 F.3d 1269, 1279 (7th Cir. 1997). We look at the totality of the circumstances to determine whether Kaniff freely consented to the x-ray. *Id.* at 1278.

In deciding this question, the district judge weighed the testimony and made a credibility determination regarding whether Kaniff voluntarily consented to the x-ray. The court heard Kaniff first testify that she did not consent to the x-ray, and then heard her admit on cross-examination that she signed a form that would allow her to be taken to

a hospital for an abdominal x-ray. The court also heard Kaniff deny that she was informed of her right to refuse to consent to the x-ray. The court found Supervisor Woods's testimony that he informed Kaniff of her right to refuse to consent more credible. This is enough to establish that the court's findings of both the fact of her consent and the voluntariness of her consent were not clearly erroneous.

## D

This leaves one loose end for us to tie up. Kaniff, the government, and the district court all agree that the scope of the government's liability in this FTCA action is limited to conduct that is wanton or willful. Another reason the district court ruled for the government was that it concluded that Kaniff had not shown conduct meeting that standard. Kaniff has also challenged that decision on appeal.

The district court decided that Kaniff could prevail only if the inspectors had engaged in willful and wanton conduct because that is the standard that would govern in the Illinois courts in a case against a public employee for acts in executing or enforcing the law. See 745 ILL. COMP. STAT. § 10/2-202 (the Illinois Local Governmental and Governmental Employees Tort Immunity Act). FTCA claims are governed by the substantive law of the state where the alleged tort occurred, 28 U.S.C. § 1346(b)(1) (adopting "law of the place where the act or omission occurred"); *Stratmeyer v. United States*, 67 F.3d 1340, 1345 (7th Cir. 1995). The tort liability of the United States under the FTCA is established "in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 2674. Although we do not need to reach the issue because we have already found each of the searches in this case supported by ample justification or Kaniff's consent, we note that this court has never held that state immunity

rules set the standard to be applied to the federal government in an FTCA suit. Other courts have considered this question and arrived at different conclusions. Compare *Estate of Warner v. United States*, 743 F. Supp. 551, 554 (N.D. Ill. 1990) (holding Illinois wanton and willful standard is adhered to as part of the "under like circumstances" analysis in FTCA claim); *Crider v. United States*, 885 F.2d 294, 296 (5th Cir. 1989) ("We are not looking to state law insofar as it immunizes a public entity from liability; rather, we are seeking 'like circumstances' which best articulate a state's negligence law."); *Louie v. United States*, 776 F.2d 819, 825 (9th Cir. 1985) (adopting state law setting liability of state and municipal entities for government actors in FTCA cases), with *Hyatt v. United States*, 968 F. Supp. 96, 107-08 (S.D.N.Y. 1997) (refusing to apply wanton and willful standard from Illinois law to government actors in FTCA suit). This case is not the right one in which to assess whether the policy decision of the State of Illinois to exempt from liability certain torts of its agents should apply in an FTCA case.

## III

We have no wish to minimize the unpleasantness of the procedures to which Kaniff was subjected. Nevertheless, the law simply does not require law enforcement officials, including Customs inspectors, to be right every time. They are obliged instead to have the requisite level of information—sometimes reasonable suspicion, sometimes probable cause—before they act. The district court's underlying fact findings here were not clearly erroneous, and we are satisfied on our *de novo* review that its conclusions were correct. We therefore AFFIRM the judgment of the district court.

No. 02-2184                                                    19

A true Copy:

    Teste:


                    _____
                    *Clerk of the United States Court of*
                      *Appeals for the Seventh Circuit*