**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Babatunde YAKUBU,**
**Defendant–Appellant.**

**No. 90–1657.**

United States Court of Appeals,
Seventh Circuit.

Submitted June 10, 1991.[*]

Decided July 8, 1991.

---

[*] After preliminary examination of the briefs, the court notified the parties that it had tentatively concluded that oral argument would not be helpful to the court in this case. The notice provided that any party might file a "Statement as to Need of Oral Argument." *See* Fed.R. App.P. 34(a); Circuit Rule 34(f). No such statement having been filed, the appeal has been submitted on the briefs and record.

Barry R. Elden, Pamela Pepper, Asst. U.S. Attys., Office of U.S. Atty., Crim. Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee.

Craig J. Katz, Chicago, Ill., for defendant-appellant.

Before CUDAHY and COFFEY, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

PER CURIAM.

This case involves a "balloon swallower" who attempted to smuggle narcotics into this country hidden in his alimentary canal. After a bench trial, Babatunde Yakubu was convicted of one count of possession with intent to distribute 334 grams of a mixture containing heroin in violation of 21 U.S.C. § 841(a)(1) and one count of willfully importing 334 grams of a mixture containing heroin in violation of 21 U.S.C. § 952. He appeals from the district court's denial of his motion to suppress evidence and quash his arrest.

The parties stipulated to the following facts. On June 18, 1989 at about 2:00 p.m., Yakubu arrived at O'Hare International Airport on a flight from Lagos, Nigeria. Yakubu is a Nigerian citizen and a permanent resident of this country. At customs, Inspector James Scoles noted that Yakubu had taken two recent trips to Nigeria between February 24, 1989 and March 1, 1989, and from April 13 to 19, 1989. Scoles knew that Nigeria is a source country for heroin. Yakubu said that he bought his one-way plane ticket with cash and that he had been in Nigeria to visit his sick mother. Scoles noticed that Yakubu had purchased his tickets at "Transmission Travel" and "CES Travel," which are often used, though not exclusively, by Nigerian heroin smugglers.

Inspectors David Hillman and Jack Ladd inspected Yakubu's luggage and found a bottle of lomotil tablets and a package of ground charcoal. The inspectors knew that lomotil suppresses bowel movements and the charcoal, when swallowed, absorbs the stomach acids which aid in digestion. These items are frequently, but not exclusively, used by people smuggling narcotics in their alimentary canal.

Hillman then patted Yakubu down. Yakubu appeared nervous and said "Oh please don't do that," when Hillman patted his stomach. Hillman noted that Yakubu's abdomen was distended and rigid, indicating that the stomach and bowels were filled to capacity—another common trait in person's smuggling narcotics in their alimentary canal. Yakubu was then referred to an interview with various inspectors and special agents.

During the interview, Yakubu became nervous whenever asked questions relating to contraband. He refused to consent to an x-ray of this abdomen, stating that his doctor, John Gleason at St. Anthony Hospital in Chicago had told him not to be x-rayed for eight years because of x-rays taken following a shooting incident. Yakubu also said that x-rays make him dizzy. An agent called St. Anthony's where Drs.

Thomas Gleason—John's son—and Allemayehu Bekele both stated that there is no set of conditions that precludes the use of x-rays for eight years and that dizziness is not a side effect. When told this, Yakubu said that he preferred not to have x-rays because he had had enough of them.

Inspector Ulanowski asked Yakubu how much "ebba" he had eaten lately. Ebba is a dough-ball pastry made from cassava that is used by Nigerian internal narcotics smugglers to practice their swallowing technique. At first Yakubu said he did not understand the question. Next he said did not know what ebba was; then he said he had not eaten any ebba; and finally he said that he had eaten ebba a few days earlier.

Yakubu said his wife was waiting for him in the airport terminal. Agents went and looked but found no one waiting for him. Ulanowski asked Yakubu for his wife's phone number. Yakubu gave two wrong numbers before providing the number of Sola Yakubu who lived at 820 West Belle Plaine in Chicago. The agents asked why his travel documents showed his address as 927 East 192nd in Glenwood. Yakubu said that he lived at Belle Plaine, and that the Glenwood address was his uncle's pharmacy where he lived and worked during the week.

At 8:45 p.m., Agent Kaczmarek told Yakubu that there was a reasonable suspicion that Yakubu was concealing contraband. Yakubu again declined to take an x-ray. Kaczmarek told Yakubu that he would either be held until Yakubu had a bowel movement or the agents could obtain a court order for x-rays.

The agents then took Yakubu to Resurrection Hospital where he refused to sign an x-ray consent form or a hospital release form. They waited in the hospital's waiting room. At 10:00 a.m. on June 19, Yakubu asked to use the toilet. The agents monitored him while he had a bowel movement. Yakubu told the Inspectors Richard Green and Jack Ladd that he had swallowed 82 balloons. Agent John Stecker then read Yakubu his *Miranda* rights. He passed 31 balloons approximately 1 inch by 2 inches in diameter. Hospital officials observed that the surface of one balloon was deteriorated and they placed Yakubu in the surgical intensive care unit. Yakubu agreed to sign himself in as a patient and submit to an x-ray and body cavity search.

At 3:42 p.m. that afternoon Yakubu passed 34 more balloons. At 8:51 p.m. that evening, he passed ten more. He passed three more at 9:43 p.m., two more at 12:53 on June 20, and two more at 2:37 that same morning. An x-ray showed that no more foreign objects remained in Yakubu's body.

After his indictment, Yakubu filed a motion to suppress the evidence and quash the arrest. The court did not hold a hearing because the motion raised only a question of law and denied the motion citing *United States v. Montoya de Hernandez*, 473 U.S. 531, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985), which states the relevant standard for "balloon swallowers" at the border. Yakubu waived his right to a jury trial, and the district court conducted a bench trial, returning guilty verdicts on both counts. Yakubu filed a motion for a new trial, arguing that the district court erred in relying on *Montoya de Hernandez* to deny the motion to suppress. The district court denied this motion and sentenced Yakubu to a 60 month term of imprisonment to be followed by a four-year period of supervised release.

## ANALYSIS

■ In non-warrant cases such as this one, this court applies a *de novo* review of the customs agents' probable cause determinations. *See United States v. McKinney*, 919 F.2d 405, 412 (7th Cir.1990). Both in his brief before the district court and now on appeal, Yakubu has cited to a number of cases involving drug traffickers who were stopped in airports. As the district court properly noted, these cases involved suspects traveling within the borders of the United States. The crucial difference here is that Yakubu was attempting to cross the border into the U.S.

This case is controlled by *Montoya de Hernandez*. There a woman arrived in Los Angeles from Bogota, Columbia, a source city for narcotics. *Montoya de Her-*

*nandez*, 473 U.S. at 533, 105 S.Ct. at 3306. The customs inspector noticed that she had made eight recent trips to the U.S. from Bogota. She spoke no English and had no family or friends in the U.S. She claimed to have come to L.A. to purchase goods for her husband's store in Bogota, but she had no appointment with merchandise vendors. She also had no hotel reservations, could not remember how her plane ticket was purchased and carried $5000 in cash without a billfold. Suspecting the woman might be smuggling drugs in her alimentary canal, a female inspector conducted a strip search and found the woman's abdomen had a "firm fullness, as if [she] were wearing a girdle." *Id.* at 534, 105 S.Ct. at 3307. The woman refused to consent to an x-ray and was detained until she passed 88 balloons which contained cocaine. Her detention before arrest lasted 16 hours. *Id.* at 535, 105 S.Ct. at 3307.

■ The Supreme Court held that the detention was reasonable and therefore did not violate the Fourth Amendment. The Court held that "detention of a traveler at the border, beyond the scope of a routine customs search and inspection, is justified at its inception if customs agents, considering all the facts surrounding the traveler and her trip, reasonably suspect that the traveler is smuggling contraband in her alimentary canal." *Id.* at 541, 105 S.Ct. at 3310. The Executive has plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant, in order to regulate the collection of duties and to prevent the introduction of contraband into this country. *Id.* at 537, 105 S.Ct. at 3308. The Fourth Amendment's balance of reasonableness is qualitatively different at the international border than in the interior. *Id.* at 538, 105 S.Ct. at 3309. Reasonable suspicion, rather than probable cause, suffices at the border because the expectation of privacy is less there.

■ As the district court noted, this case includes obvious similarities with *Montoya de Hernandez.* In each case the defendant arrived from a "source country" and had made several trips there recently. Both had difficulty giving reasonable answers to routine questions. Moreover, in both cases pat-down searches revealed distention in the defendant's abdomen and both defendants refused to consent to x-rays. The periods of detention before arrest, sixteen hours in *Montoya de Hernandez* and twenty hours in the instant case, are also comparable.

■ Yakubu makes a feeble attempt at distinguishing the facts of his case. He argues that unlike the defendant in *Montoya de Hernandez*, he spoke English, had both relatives and a home in this country, was returning from visiting a sick mother, and had no unusual amounts of cash on him. Of course, the facts of each case differ. The Supreme Court does not sit to decide cases that will control only cases having identical facts. *Rivera v. Director, Dept. of Corrections*, 915 F.2d 280, 282 (7th Cir.1990). And if in some ways Yakubu's case was stronger than the defendant's in *Montoya de Hernandez*, in others it was weaker. He bought his tickets in cash from travel agents known to be frequented by heroin smugglers. He carried in his suitcase both lomotil and charcoal, a combination likely to stop both bowel movements and digestion. He protested before the customs officer touched his stomach during a pat down. He became visibly upset each time contraband was mentioned. He lied about his wife's phone number, twice. He lied about why he could not submit to x-rays. He also waffled under questioning over whether he had eaten "ebba" lately. The customs officials' suspicion that Yakubu was carrying narcotics internally was every bit as reasonable as it was in *Montoya de Hernandez.*

For this reason, the decision of the district court denying the motion to suppress evidence was proper and the conviction is

AFFIRMED.