

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-25-2002

# Bradley v. USA

Precedential or Non-Precedential: Precedential

Docket No. 01-4103

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"Bradley v. USA" (2002). *2002 Decisions.* Paper 434.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/434

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed July 25, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-4103

YVETTE BRADLEY,
        Appellant

v.

THE UNITED STATES OF AMERICA; UNITED STATES
CUSTOMS SERVICE; RAYMOND W. KELLY,
COMMISSIONER OF THE UNITED STATES CUSTOMS
SERVICE, in his official capacity; SAMUEL H. BANKS,
DEPUTY COMMISSIONER OF THE UNITED STATES
CUSTOMS SERVICE, in his official capacity; ROBERT J.
MCNAMARA, Acting Assistant Commissioner for the Office
of Field Operations, United States Customs Service, in his
official capacity; CHARLES WINWOOD, former Assistant
Commissioner for the Office of Field Operations, United
States Customs Service, in his office capacity; RICARDO
BOWEN, Passenger Service Representative of the United
States Customs Service at Newark Airport, in his official
capacity; KATHLEEN HAAGE, Port Director of the United
States Customs Service in the New York/Newark Area, in
her official capacity; UNITED STATES CUSTOMS
SUPERVISORY INSPECTOR LUCIANA, in his official
capacity; UNITED STATES CUSTOMS INSPECTORS,
Holding Badge Numbers 40211, 15538 and 37018, In
Their Official and individual capacities; AND AN
UNKNOWN NUMBER OF UNNAMED AND UNKNOWN
INSPECTORS AND SUPERVISORS OF THE UNITED
STATES CUSTOMS SERVICE, in their official and
individual capacities; MICHELLE MAZZARULLI,
United States Customs Inspector in her official and
individual capacities; JACKIE CASTLEBERRY, Customs
Inspector, in her official and individual capacities;

ANTHONY SCARINGELLA, Inspector, in his official and
individual capacities

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
D.C. Civil No. 00-cv-02317
District Judge: The Honorable Nicholas H. Politan

Argued: June 4, 2002

Before: SCIRICA, BARRY, and WEIS, Circuit Judges

(Opinion Filed: July 25, 2002)

        Alix R. Rubin, Esquire (Argued)
        Lowenstein Sandler
        65 Livingston Avenue
        Roseland, NJ 07068
         -and-
        Edward Barocas, Esquire
        American Civil Liberties Union
         of New Jersey Foundation
        35 Halsey Street, Suite 4B
        Newark, NJ 07102

        Attorneys for Appellant

        Susan C. Cassell, Esquire (Argued)
        Assistant U.S. Attorney
        Office of United States Attorney
        970 Broad Street, Room 700
        Newark, NJ 07102

        Attorney for Appellees

OPINION OF THE COURT

BARRY, Circuit Judge:

Much has been written about "border searches" and we will not break much new ground here. We believe it

2

appropriate, however, particularly in light of the tragedy of September 11th and the anti-terrorism efforts being made in its aftermath, to reprise what has been written in the course of concluding that the border search at issue here was well within the bounds of law. The order of the District Court will, therefore, be affirmed.

I.

Introduction

Yvette Bradley, an African-American woman, brought this Bivens action1 against the United States, the United States Customs Service, and a number of customs inspectors, supervisors, and officials. She alleged that her constitutional rights were violated when, on April 5, 1999, customs inspectors subjected her to a search of her suitcase, purse and backpack, as well as a patdown, when she arrived at Newark International Airport on a nonstop international flight from the island of Jamaica. Bradley argued that she was selected because of her race and gender, in violation of her equal protection rights under the Fifth and Fourteenth Amendments, and that the patdown was an illegal search under the Fourth Amendment. 2 The District Court granted defendants' motion for summary judgment, and Bradley now appeals. The District Court had jurisdiction under 28 U.S.C. S 1331 and we have jurisdiction pursuant to 28 U.S.C. S 1291. We review the District Court's grant of summary judgment de novo.

Chisholm v. McManimon, 275 F.3d 315, 321 (3d Cir. 2001).

_____

1. Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971).

2. Bradley also raised a privacy claim under the Ninth Amendment, a procedural due process claim, a claim for supervisory liability, and various other claims against the United States under the Federal Tort Claims Act. She does not take issue with the District Court's decision regarding these claims and, accordingly, they are waived. Nagle v. Alspach, 8 F.3d 141, 143 (3d Cir. 1993).

II.

The Patdown -- and the Fourth Amendment

While Bradley refers in passing to the search of her luggage, her challenge is directed almost exclusively to the patdown, albeit what she describes as the "intrusive patdown," to which she was subjected at an immigration checkpoint at the Newark International Airport. She argues that in granting summary judgment, the District Court failed to construe the facts in the light most favorable to her as, of course, it was required to do given that she was the non-moving party. The facts as relevant to her Fourth Amendment claim are, however, largely undisputed. Those facts, viewed against well-settled law, defeat that claim.

It is not disputed, for example, that Jamaica is considered by Customs to be a source country for narcotics and that Jamaica Airlines Flight 19, on which Bradley arrived, is considered by Customs to be a high risk flight for narcotics, although Bradley herself does not believe either to be so. It is also not disputed that Bradley was subjected to a patdown, and not a strip search, a body cavity search, or any other type of highly intrusive search. It is not disputed that the patdown was done over Bradley's dress by a female inspector in the presence of a second female inspector and that Bradley's skin was not directly touched in any intimate area. It is not disputed that when the patdown reached what Bradley calls her "groin area," her internal genitalia were not penetrated through the dress. Crediting her version of the facts, the touching that occurred involved the inspector "us[ing] her fingers to inappropriately push on [Bradley's] breasts and into the inner and outer labia," Bradley aff. P 28, the latter concededly part of the external genitalia of a woman.3

_____

3. We note, without further comment, that the"us[ing] her fingers to inappropriately push . . . into" language is a change from the "rub her hands . . . over" language in the Complaint and Amended Complaint. JA129, 357. While the District Court appeared to concentrate on the language in the complaints rather than the affidavit, we will focus, as does Bradley, on the affidavit while reaching the same result the District Court reached.

Bradley, we note, was not wearing underwear and does not dispute that had she been doing so, the additional layer of cloth would have reduced any intrusion that took place. And, of course, Bradley does not dispute that no drugs or other contraband were found.

Neither does Bradley take issue with the law, nor could she, for courts, including our Court, have long held that routine searches at our nation's borders are presumed to be reasonable under the Fourth Amendment. See , e.g., United States v. Ramsey, 431 U.S. 606, 616 (1977); United States v. Hyde, 37 F.3d 116, 118-20 (3d Cir. 1994); United States v. Ezeiruaku, 936 F.2d 136, 140 (3d Cir. 1991). Immigration checkpoints at international airports are the functional equivalent of national borders. Almeida-Sanchez v. United States, 413 U.S. 266, 273 (1973). As a sovereign state, the United States has the right to "protect itself by stopping and examining persons and property crossing into this country." Ramsey, 431 U.S. at 616. 4 "Since the founding of our Republic, Congress has granted the Executive plenary power to conduct routine searches and seizures at the border, without probable cause or a warrant, in order to regulate the collection of duties and to prevent the introduction of contraband into this country." United States v. Montoya de Hernandez, 473 U.S. 531, 537 (1985). For example, Congress has empowered border officials to detain and search "all persons coming into the United States from foreign countries." 19 U.S.C.S 1582; see also 19 U.S.C. S 1496 (authorizing customs officials to search the baggage of persons entering the country); 19 C.F.R. S 162.6 (authorizing customs officials to inspect and search all persons, baggage, and merchandise arriving from foreign countries).

It has, of course, also long been true that our nation's historic concern for the integrity of its borders has been

---

4. Courts have also long held that an individual's reasonable expectation of privacy is lower at the border than in the interior of the country. See, e.g., Carroll v. United States, 267 U.S. 132, 154 (1925). "[T]he Fourth Amendment balance between the interests of the Government and the privacy right of the individual is . . . struck much more favorably to the Government at the border." United States v. Montoya de Hernandez, 473 U.S. 531, 540 (1985).

"heightened by the veritable national crisis in law enforcement caused by [the] smuggling of illicit narcotics." Montoya de Hernandez, 473 U.S. at 538 (citing United States v. Mendenhall, 446 U.S. 544, 561 (1980) (Powell, J., concurring). And it is beyond peradventure, as the Seventh Circuit has noted, that "the events of September 11, 2001, only emphasize the heightened need to conduct searches" at our borders. United States v. Yang, 286 F.3d 940, 944

n.1 (7th Cir. 2002).

In Montoya de Hernandez, the Supreme Court's most recent case on border searches, the Court reiterated that, because the Fourth Amendment's balance of reasonableness is qualitatively different at the international border than in the interior, "routine searches" of persons and their effects at the border "are not subject to any requirement of reasonable suspicion, probable cause, or warrant." 473 U.S. at 538 (citing Ramsey, 431 U.S. at 616-19; Almeida-Sanchez, 413 U.S. at 272-73; and Carroll, 267 U.S. at 154). The Court had not previously determined what level of suspicion would justify the detention of an incoming traveler in a nonroutine border search and inspection. In Montoya de Hernandez, however, the Court concluded that an alimentary canal search was not "routine" and is justified only if customs agents reasonably suspect that the traveler is smuggling contraband in his or her alimentary canal. "Reasonable suspicion" was defined as" 'a particularized and objective basis for suspecting the particular person' " of smuggling contraband. Id. at 541 (quoting United States v. Cortez, 449 U.S. 411, 417 (1981)). The Court explicitly declined, however, to determine, "what level of suspicion, if any, is required for[other] nonroutine border searches such as strip, body-cavity, or involuntary x-ray searches." Id. at 541 n.4 (emphasis added).

In the course of concluding that an alimentary canal search must be supported by reasonable suspicion, and that reasonable suspicion supported the search of the balloon swallower before it, the Court bemoaned the"subtle verbal gradations" being developed by courts of appeals to enunciate the Fourth Amendment standard of reasonableness which "may obscure rather than elucidate the meaning of the provision in question." 473 U.S. at 541.5

---

5. The Court noted by way of example that the Ninth Circuit in Montoya de Hernandez used "clear indication" of smuggling language, 731 F.2d

6

The Second Circuit viewed this statement as "warning" against the development of multiple gradations of suspicion to be applied to different types of border searches. United States v. Charleus, 871 F.2d 265, 268 n.2 (2d Cir. 1989).

While we have not had the occasion to address the question left open in Montoya de Hernandez  -- the level of suspicion, "if any," necessary to conduct at least certain types of nonroutine searches -- those court of appeals that have done so agree that reasonable suspicion is required. United States v. Gonzalez Rincon, 36 F.3d 859, 864 (9th Cir. 1994); United States v. Yakubu, 936 F.2d 936, 939 (7th Cir. 1991); United States v. Carreon, 872 F.2d 1436, 1442 (10th Cir. 1989); Charleus, 871 F.2d at 267; United States v. Oyekan, 786 F.2d 832, 837-39 (8th Cir. 1986).

We are not, of course, dealing here with a strip search or

a body cavity search or any of the other typical nonroutine searches, but, rather, with a patdown. While the Supreme Court has never articulated what makes a border search routine and has never explicitly classified patdowns as routine, of those courts of appeals which have addressed the patdown issue since Montoya de Hernandez, none has held that a standard patdown at the border is a nonroutine search requiring reasonable suspicion and all have held

_____

1369, 1372 (9th Cir. 1984) and the Eleventh Circuit, on almost identical facts, adopted a reasonable suspicion standard. United States v. Mosquera-Ramirez, 729 F.2d 1352, 1355 (11th Cir. 1984). Prior to Montoya de Hernandez, varying levels of suspicion were found to justify various types of border searches. See, e.g., United States v. Dorsey, 641 F.2d 1213, 1218-19 (7th Cir. 1981) (adopting a case-by-case balancing test to determine the precise level of suspicion needed to search and declining to label the requisite degrees of suspicion); United States v. Sandler, 644 F.2d 1163, 1166-69 (5th Cir. 1981) (requiring "mere suspicion" to justify a routine border search and"reasonable suspicion" for more intrusive searches such as a strip search); United States v. Grayson, 597 F.2d 1225, 1228 (9th Cir. 1979) (discussing a "mere suspicion" and "no suspicion" standard); United States v. Carter, 563 F.2d 1360, 1361 (9th Cir. 1977) (holding that "mere suspicion" was necessary for patdown searches at the border); United States v. Kallevig, 534 F.2d 411, 413 n.4 (1st Cir. 1976) (a border search that is less intrusive than a strip search requires no level of suspicion).

7

that such patdowns come within the "routine" border search category and, thus, require no suspicion whatsoever.6 United States v. Beras, 183 F.3d 22, 26 (1st Cir. 1999); Gonzalez-Rincon, 36 F.3d at 864 (luggage searches and patdowns are routine and do not require reasonable suspicion); Carreon, 872 F.2d at 1442; Oyekan 786 F.2d at 835; c.f. Charleus, 871 F.2d at 268 (the patdown in that case was a routine border search requiring no level of suspicion at all).7 We now join those courts, although we do not foreclose the possibility that a patdown gone awry could become so intrusive as to become a nonroutine search requiring application of the reasonable suspicion standard.8

_____

6. The Second Circuit has also held that lifting a woman's skirt at the border to look for contraband is a routine search not requiring any suspicion. See, e.g., Charleus , 871 F.2d at 268; see also United States v. Braks, 842 F.2d 509, 511-15 (1st Cir. 1988)(noting that the lifting of a woman's skirt to check for contraband was a routine search not necessarily requiring any degree of suspicion).

7. Somewhat surprisingly, the government argues to us and argued before the District Court, with the District Court finding it "undisputed," that "[a]t the border, Customs Inspectors can send someone for a patdown with mere suspicion." JA47. The argument that "mere suspicion" is required is presumably based on the U.S. Customs Service's Personal Search Handbook that, in discussing "Procedures Applicable to Patdowns," states that "Some or Mere Suspicion is Required." The sole support for this statement, however, is a 1975 Ninth

Circuit case which does not so clearly stand for the proposition for which it is cited and which, in any event, has been effectively overruled by the Ninth Circuit's post-Montoya de Hernandez decision in Gonzalez-Rincon.

8. It appears that when the Seventh Circuit is called upon to decide the issue it, too, will join. The Court, in Saffell v. Crews, 183 F.3d 655 (7th Cir. 1999), although reviewing only a partial strip search, nonetheless observed that the patdown which had preceded the strip search revealed a bulge through Saffell's clothes "in the most intimate area of her body, a place where drugs are sometimes known to be secreted by women." 183 F.3d at 657. It found that "there was justification" for the patdown, id., and did not even suggest that patting down the crotch area turned the patdown into an intrusive patdown search requiring reasonable suspicion. It is unclear, however, by the use of the word "justification" whether it believed that the balancing test adopted in its 1981 Dorsey case, see n.5 supra, continues to be viable after Montoya de Hernandez. It appears, however, that, while not ignoring Dorsey, the Court subsequently dropped that test when it held that there are but two

8

This, says Bradley, was just such a case, with the patdown to which she was subjected so intrusive that, although it was concededly not a body cavity or strip search, it became "nonroutine," thereby requiring reasonable suspicion which, she argues, did not exist. We need not decide whether the customs inspectors reasonably suspected that Bradley was smuggling contraband because we conclude that the patdown was not so intrusive as to be transformed into a nonroutine border search.

Bradley has not pointed us to any court of appeals' decision subsequent to Montoya de Hernandez which has held that on a border search even an "intrusive" patdown is nonroutine and must be supported by reasonable suspicion. See n.9 infra. Rather, she relies for this proposition on Anderson v. Cornejo, 199 F.R.D. 228 (N.D. Ill. 2000), a decision which simply does not do for Bradley what it did for the one named plaintiff in that class action who survived a motion for summary judgment. Viewing the facts in her favor, the District Court found that the plaintiff was subjected to an intrusive patdown search which involved the customs inspector pushing her hand through plaintiff's clothes and her finger into plaintiff's vagina six times causing pain. The Court found that this was "close enough to a cavity search and done repeatedly enough to be more than just a standard patdown search," 199 F.R.D at 260-61, and that reasonable suspicion did not exist. The Court noted two other types of conduct that, in its view, would cause a patdown to become so intrusive that it could be justified only by reasonable suspicion. First, it suggested that a patdown in which an "inspector reaches under the traveler's clothes, particularly in the breast and crotch area" would require reasonable suspicion. Id. at 258. As an example, the Court cited an earlier incarnation of Saffell v. Crews, discussed above in note 8, where Saffell alleged (an

_____

categories of border searches -- routine searches that require no

suspicion and nonroutine searches that require reasonable suspicion. United States v. Johnson, 991 F.2d 1287, 1291-92 (7th Cir. 1993). Moreover, to employ a balancing test after Montoya de Hernandez would contravene the Supreme Court's warning against multiple gradations of suspicion.

9

allegation later disproved at a bench trial) that"the inspector reached under Saffell's bra and under her underwear, examining Saffell's entire pubic area and inserting her finger in Saffell's vagina." Id. at 258 n.33. Second, the Court suggested that the "[f]ondling of a traveler's genital area, breasts, or buttocks area during a patdown would also constitute an intrusive patdown." Id. at 258. The Court defined "fondling" as touching"in a sexual or sexually suggestive manner." Id. at 259. It noted, however, that even an "aggressive" patdown in the crotch or breast area would be sufficiently intrusive to require reasonable suspicion. Id.

Anderson, we reiterate, is the sole decision on which Bradley's argument depends. There is, however, nothing in Anderson, either in the conduct it was reviewing or in the conduct that it hypothesized could warrant relief, that comes close to that which Bradley describes. While, as the District Court observed in Bradley's case, "[p]enetration of [a woman's] internal genitalia, absent reasonable suspicion, would in all likelihood constitute an unreasonable search," JA28-29, customs officials as a matter of standard procedure are permitted to feel over clothing for bulges in an area known by them as a common place for hiding contraband. JA29. That is precisely what they did here, and the District Court correctly rejected Bradley's Fourth Amendment claim.

This was, no doubt, a disagreeable experience for Bradley. That it was not, in our view, a constitutional violation does not mean, in the words of the Saffell Court, "that Customs agents have free license to exceed what is reasonable and proper under the law in order to accomplish their important responsibilities. They must be sensitive to their intrusive powers and not abuse and misuse those powers . . . ." Saffell, 183 F.3d at 659.

One final note. The District Court concluded that even if Bradley had made out a prima facie claim of a constitutional violation, the three named customs inspectors would be entitled to qualified immunity. Given our conclusion that no Fourth Amendment violation was stated, we need not reach this issue. We note, however, that in April 1999, when Bradley arrived at the Newark

10

International Airport, there was no law post-Montoya de Hernandez, much less "clearly established" law, that at our nation's borders even an intrusive patdown search was

anything other than "routine" such that it required reasonable suspicion.9

III.

Equal Protection Violation

The fact that there was no Fourth Amendment violation does not mean that one was not discriminatorily selected for a search. Bradley alleges that the defendants violated her right to equal protection under the Fifth and Fourteenth Amendments to the United States Constitution when customs officials selected her for a luggage and then a patdown search because she was an African-American female.10 To make an equal protection claim in the profiling context, Bradley was required to prove that the actions of customs officials (1) had a discriminatory effect and (2) were motivated by a discriminatory purpose. Arlington Heights v. Metro. Housing Dev. Corp., 429 U.S. 252, 264-66 (1977) (race discrimination); Washington v. Davis, 426 U.S. 229, 239-42 (1976) (race discrimination); Chavez v. Illinois State Police, 251 F.3d 612, 635-36 (7th Cir. 2001) (racial profiling) (citing Personnel Adm'r of Mass. v. Feeney, 442 U.S. 256, 272-74 (1979) (gender discrimination). Bradley's equal protection claim is bereft of proof.

_____

9. Aside from Anderson, Bradley cites three post-Montoya de Hernandez cases for the proposition that "[i]n April 1999, the law was clearly established that reasonable suspicion was required to conduct an intrusive patdown search." App. Br. at 17. None stands for that proposition. One involved the search of a suitcase, not a patdown; the second involved an alimentary canal search, with the patdown that preceded that search not challenged; and the third, our decision in United States v. Hyde, specifically stated that"[w]e have no occasion here to speak to [that issue]." 37 F.3d at 118 n.1.

10. Bradley also avers that black women are generally targeted by customs officials for airport searches at Newark International Airport. As the District Court properly noted, however, this is not a class action.

11

To prove discriminatory effect, Bradley had to show that she is a member of a protected class and that she was treated differently from similarly situated individuals in an unprotected class. Chavez, 251 F.3d at 636; see also United States v. Armstrong, 517 U.S. 456, 469 (1996); Andrews v. City of Philadelphia, 895 F.2d 1469, 1478 (3d Cir. 1990). Bradley, an African-American woman, is clearly a member of a protected class. Thus, our sole inquiry under this prong of the analysis is whether Bradley submitted evidence that customs officials treated her differently from similarly situated members of an unprotected class. Discriminatory effect may be proven by naming similarly situated members of an unprotected class who were not selected for the same search or, in some cases, by submitting statistical evidence of bias. Chavez , 251 F.3d at 636.11

While her primary complaint is, again, directed to the patdown, Bradley also argues that customs officials selected her for the luggage search based on the fact that a group of unidentified but similarly situated white males -- similarly situated because they were wearing baseball caps while she was wearing a wool designer hat with two braids hanging down the sides -- were not selected to have their luggage searched. Even if we assume that the white males were similarly situated, an assumption we are somewhat loathe to make, Bradley failed to submit any evidence that she was unfairly singled out. The mere fact

_____

11. In profiling cases, where it is often difficult to submit direct evidence that members of an unprotected class were not targeted for a search, statistical evidence of discrimination may be the only means of proving a discriminatory effect. As the Seventh Circuit explained:

> In a meritorious selective prosecution claim, a criminal defendant would be able to name others arrested for the same offense who were not prosecuted by the arresting law enforcement agency; conversely, plaintiffs who allege that they were stopped due to racial profiling would not, barring some type of test operation, be able to provide the names of other similarly situated motorists who were not stopped.

Chavez, 251 F.3d at 640. And "[w]hile it is true that statistics alone rarely state a violation of equal protection . . . they can be sufficient to establish discriminatory effect." Id.

that a few unidentified white males on a flight of many passengers were not selected when Bradley was does not, without more, demonstrate a discriminatory effect. As to her selection for a patdown search, Bradley has conceded that the only other person on her flight of whom she was aware who was selected for a patdown search was a white male who, we note, was found carrying drugs. This certainly does not indicate discrimination. Finally, Bradley failed to submit any statistical evidence of bias. There was, then, no evidence of discriminatory effect before the District Court.

Bradley does not contest this conclusion; rather, she argues that she failed to meet her burden of proof because the District Court restricted discovery and then granted summary judgment prematurely. "[W]e review a claim that the district court has prematurely granted summary judgment for abuse of discretion." Pastore v. Bell Telephone Co. of Penn., 24 F.3d 508, 510 (3d Cir. 1994). Although Bradley claims that additional discovery was critical to her case, she failed to file an affidavit pursuant to Federal Rules of Civil Procedure 56(f) identifying "with specificity what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not previously been obtained." St. Surin v. Virgin Island Daily News, Inc., 21 F.3d 1309, 1314 (3d Cir. 1994) (citation and

internal quotations omitted). We have made clear that, in all but the most exceptional cases, failure to comply with Rule 56(f) is fatal to a claim of insufficient discovery on appeal. Pastore, 24 F.3d at 511 (citing Falcone v. Columbia Pictures Indus., Inc., 805 F.2d 115, 117 n.2) (3d Cir. 1986)). While Bradley argues that she constructively met the Rule 56(f) affidavit requirement, we have generally rejected constructive compliance arguments. See. e.g., Radich v. Goode, 886 F.2d 1391, 1394 (3d Cir. 1989). Given the strong presumption against a finding of constructive compliance with Rule 56(f), the District Court did not abuse its discretion when it granted summary judgment without allowing additional discovery.12

_____

12. And this is not one of the "exceptional" cases falling outside of the general rule that constructive compliance with Rule 56(f) will not suffice.

13

The discovery Bradley now says she needed was discovery she had received, including the documents relating to her entry on April 5, 1999; discovery that was irrelevant to her case; or discovery that did not exist -- for example, ten years of "incident logs and Search and Seizure Reports" concerning passengers arriving on Flight 19 from Jamaica. The government has advised that there are no such records and, even if there were, prior to late 1999 "no notations of the race" -- or presumably, the gender -- "of passengers sent for secondary inspections and/or pat-down searches were required to be kept." Appellee's Br. at 17.
Evaluating the record that was before the District Court, we conclude that Bradley failed to present evidence that, when viewed in the light most favorable to her, would demonstrate a "discriminatory effect." Accordingly we need not determine, as the District Court did not need to determine, whether the customs officials acted with a "discriminatory purpose" when they selected Bradley for the luggage and patdown searches.

IV.

Conclusion

The order of the District Court will be affirmed.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

14