

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-20-2002

# Carrasca v. Pomeroy

Precedential or Non-Precedential: Precedential

Docket No. 02-1127

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"Carrasca v. Pomeroy" (2002). *2002 Decisions.* Paper 800.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/800

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

No. 02-1127

MARCO ANTONIO CARRASCA;
FIDEL FIGUEROA; ABIMAEL FIGUEROA;
RIGOBERTO VALES BARRERAS,

Appellants

v.

EDWARD POMEROY and STEVE LOSEY,
in their individual capacities

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil No. 00-cv-03590)
District Judge: Hon. Faith S. Hochberg

Argued September 10, 2002

Before:  SLOVITER, RENDELL, and FUENTES, Circuit Judges

(Filed: December 17, 2002)

Daniel Werner    (Argued)
Patricia C. Kakalec
Farmworker Legal Services of New York, Inc.
New Paltz, N.Y.  12561

        Attorneys for Appellants

Robert P. Shane   (Argued )
        Deputy Attorney General
Patrick DeAlmeida
        Deputy Attorney General
David Samson
        Attorney General of New Jersey
Office of Attorney General of New Jersey
Department of Law & Public Safety
Trenton, N.J.  08625

        Attorneys for Appellees


OPINION OF THE COURT

SLOVITER, Circuit Judge.

While the incidents that form the basis of this claim may seem trivial at first, to the

Plaintiffs who were subjected to them they presented a paradigmatic case of racial

profiling.  The parties testified to differing versions of the relevant facts.  The District

Court failed to view the facts in the light most favorable to Plaintiffs and accordingly erred

in granting summary judgment based on qualified immunity and the merits.

**I.**

**Introduction**

Plaintiffs Marco Antonio Carrasca, Fidel Figueroa, Abimael Figueroa, and

Rigoberto Vales Barreras filed suit against Edward Pomeroy, a former New Jersey State

Park Ranger, and Steve Losey, a former Visitor Service Assistant at Waywayanda State Park

(referred to collectively as "the Rangers"), in the United States District Court for the

District of New Jersey under 42 U.S.C. § 1983,[1] claiming that the Rangers violated

Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment and the

Fourth Amendment. They further claimed that the Rangers violated 42 U.S.C. §§ 1981[2] and

1985(3)[3] and the New Jersey Law against Discrimination.[4]

---

[1] Section 1983 reads, in pertinent part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

[2] Section 1981(a) reads: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

[3] Section 1985(3) reads, in pertinent part: "If two or more persons in any State or Territory conspire, or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; . . . if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators."

[4] The New Jersey Law Against Discrimination, N.J. Stat. Ann. § 10:5-4, reads: "All persons shall have the opportunity to obtain employment, and to obtain all the accommodations, advantages, facilities, and privileges of any place of public accommodation, publicly assisted housing accommodation, and other real property without discrimination because of race, creed, color, national origin, ancestry, age, marital status, affectional or sexual orientation, familial status, sex, or source of lawful income used for

The District Court granted the Rangers' motion for summary judgment and dismissed Plaintiffs' case in its entirety with prejudice. Plaintiffs appeal, contending that summary judgment was inappropriate because there were genuine issues of material fact. In contrast, the Rangers argue that all parties are in agreement as to all of the material facts. Based on the record before us, we conclude that significant factual disputes existed and that the District Court should have viewed the facts in the light most favorable to Plaintiffs, thus precluding summary judgment.

## II.

### Background

A.      Facts

Plaintiffs claim that shortly after 6 p.m. on August 3, 1998, they entered a lake in Waywayanda State Park, located in Sussex, New Jersey, and that there were between fifteen to twenty-five other swimmers in the lake at that time. (Dep. of Fidel Figueroa at 20; Barreras at 18; Carrasca at 29). The Rangers agree. (Dep. of Pomeroy at 20). Furthermore, Pomeroy claims, and Plaintiffs do not deny, that Pomeroy arrived at the lake between approximately 6:15 and 6:20 p.m., which was after the 6 p.m. posted closing time for the lake. (Dep. of Pomeroy at 8-9 and 19).

The events after this point are in dispute. The parties' version of the facts are taken

---

rental or mortgage payments, subject only to conditions and limitations applicable alike to all persons. This opportunity is recognized as and declared to be a civil right."

4

from the depositions of all four Plaintiffs and Pomeroy.[5] We will present each version of the facts, beginning with the Plaintiffs'.

According to Plaintiffs, Abimael Figueroa, the sole female Plaintiff, was not in the lake but instead was sitting on the beach when Pomeroy arrived at the scene. (Dep. of Abimael Figueroa at 20). The remaining three Plaintiffs exited the water, along with everyone else in the lake, upon Pomeroy's order to do so. (Dep. of Fidel Figueroa at 27-28; Dep. of Barreras at 28; Dep. of Carrasca at 40). A woman and child were the last to leave the lake, emerging from the water a few minutes after Plaintiffs. (Dep. of Barreras at 29). After exiting the water, Plaintiffs collected their belongings and began walking towards their car when Pomeroy approached them and, in Spanish, called them "Mexican" as if "he was making fun" and told Plaintiff Carrasca that he was "almost naked." (Dep. of Carrasca at 43). Carrasca admits that he was swimming in his underwear, which he contends were dark bikini briefs. (Dep. of Carrasca at 26).

Thereafter, Plaintiffs walked to their car at which point Pomeroy got into his patrol car, parked behind Plaintiffs' car, and got out. (Dep. of Carrasca at 44). Pomeroy then asked Plaintiffs for a driver's license, "green card," or some other form of identification. (Dep. of Fidel Figueroa at 33). Permanent residency cards are colloquially known as "green cards." United States v. Vasquez De Reyes, 149 F.3d 192, 193-94 (3d Cir. 1998).

_____

[5] While it is agreed that Losey was deposed, and excerpts are in the record, the complete transcript has not been supplied to this court and our efforts to locate it have been unsuccessful.

5

Pomeroy proceeded to take the car keys from Plaintiff Fidel Figueroa, went to his patrol car where he spoke on his radio for a few minutes, and returned to search Plaintiffs' car. (Dep. of Fidel Figueroa at 34-35). Pomeroy then arrested all four Plaintiffs without reading them their rights required under Miranda v. Arizona, 384 U.S. 436 (1966). (Dep. of Carrasca at 57). He handcuffed and placed Plaintiffs in his patrol car, drove them to the Park office, and, when there, handcuffed them to chairs. (Dep. of Fidel Figueroa at 39-40). Plaintiffs remained in that position for approximately three to four hours before Pomeroy allowed them to leave. (Dep. of Fidel Figueroa at 45). Plaintiff Fidel Figueroa collected some personal items from the car, which was impounded. (Dep. of Fidel Figueroa at 47; Dep. of Pomeroy at 57). All four Plaintiffs were given a summons for swimming after hours, for which they thereafter paid fines. (Dep. of Fidel Figueroa at 49; Dep. of Carrasca at 69). Responding to Pomeroy's orders during this time, Defendant Losey searched Plaintiffs' car and handcuffed Plaintiffs. (Dep. of Carrasca at 48-49; 62-63; 79-80).

Pomeroy's testimony significantly differed from that given by Plaintiffs. In his deposition, Pomeroy testified that after he announced over his vehicle's loudspeaker that the lake was closed for swimming, he continued his patrol of the area nearby because most of the swimmers had left the water. (Dep. of Pomeroy at 22-23). When he returned to the lake, he observed some individuals, including Plaintiffs, still swimming. (Dep. of Pomeroy at 24). At this time, Pomeroy announced for a second time that all persons had to exit the lake. (Dep. of Pomeroy at 25). Further, even after his second announcement Plaintiffs remained in the water, which prompted him to leave his car, walk to the lake, blow his

6

whistle, and wave his arms at Plaintiffs. (Dep. of Pomeroy at 27). Despite his efforts, Plaintiffs remained in the lake, and it was not until Pomeroy waved and called out for an additional five minutes that they left the water. (Dep. of Pomeroy at 28). Pomeroy noticed Plaintiffs were wearing underwear and clothes, rather than swimming suits. (Dep. of Pomeroy at 59). It was their improper attire coupled with their failure to comply with his orders to exit the water that caused him to approach them on the beach. (Dep. of Pomeroy at 59).

Unable to speak Spanish, Pomeroy asked Plaintiffs for identification in English, which they could not provide. (Dep. of Pomeroy at 32). Next, Pomeroy drove his patrol car to the parking area where he met Plaintiffs, inquired about the driver of the car and his driver's license, and asked all the Plaintiffs once again for identification, including their green cards. (Dep. of Pomeroy at 33-37). When Plaintiffs said they did not possess green cards, Pomeroy called the INS, and spoke to INS Agent Donald Sasso who told Pomeroy he would return his call because the INS had potential interest in Plaintiffs. Pomeroy then handcuffed and arrested Plaintiffs for swimming after hours, placed them in his patrol car, and took them to the Park office. (Dep. of Pomeroy at 38-39).

At the office, Pomeroy handcuffed the three male Plaintiffs to chairs. (Dep. of Pomeroy at 47). During this time, Pomeroy called his daughter who served as a Spanish interpreter and enabled Pomeroy to obtain Plaintiffs' identities and addresses. (Dep. of Pomeroy at 50-51). Agent Sasso did not return Pomeroy's initial call so Pomeroy repeatedly - albeit unsuccessfully - attempted to call Sasso again from the office. (Dep. of

7

Pomeroy at 52). Eventually, Pomeroy spoke with INS Supervisor Carol Ford who advised

him that the INS was not interested in Plaintiffs, despite Pomeroy's offer to transfer

Plaintiffs anywhere in the state of New Jersey. (Dep. of Pomeroy at 54). Thereafter,

Plaintiffs were released from the office. (Dep. of Pomeroy at 56). All four Plaintiffs pled

guilty to swimming after hours. (Dep. of Pomeroy at 58). As is evident,

Plaintiffs and Pomeroy paint significantly different pictures of the same events.

Importantly, they disagree as to how many times Pomeroy asked Plaintiffs to exit the water,

when Plaintiffs did in fact exit the water, the whereabouts of Abimael Figueroa when

Pomeroy first approached the swimming area, whether Plaintiffs' swimming attire differed

significantly from the attire of other swimmers, and the amount of time Plaintiffs were in

custody at the Park office.

B.      Procedural History

Plaintiffs' complaint described the suit as a "civil rights action brought by four

Mexican-born individuals" to redress the Rangers' discriminatory treatment of them.[6] The

District Court granted the Rangers' summary judgment motion without oral argument. In a

short opinion, after reciting the facts in a manner that Plaintiffs claim failed to view the

evidence in the light most favorable to them, it concluded that: "(i) Mr. Losey played little

or no part in detaining Plaintiffs; (ii) Defendant Pomeroy lawfully detained Plaintiffs for

---

[6] In violation of the Equal Protection Clause of the Fourteenth Amendment, the Fourth
Amendment, 42 U.S.C. § 1981, 42 U.S.C. § 1985(3), and the New Jersey Law Against
Discrimination. The Rangers filed a motion for summary judgment.

8

investigatory purposes; (iii) Defendants are entitled to Qualified Immunity. Morever, even if the Court were to reach the merits of this action, the Court finds that it is an utterly frivolous case." Opinion & Order at 3-4, Carrasca v. Pomeroy, No. 00-3590 (D.N.J. Dec. 10, 2001) (footnotes omitted).

Plaintiffs timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## III.

## Discussion

A.      Standard of Review

The standard of review applicable to an order granting summary judgment is plenary. See Witkowski v. Welch, 173 F.3d 192, 198 (3d Cir. 1999). We apply the same test employed by a district court under Federal Rule of Civil Procedure 56(c). Kelley v. TYK Refractories Co., 860 F.2d 1188, 1192 (3d Cir. 1988). Accordingly, the District Court's grant of summary judgment in favor of Pomeroy and Losey was proper only if it appears "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Plaintiffs, as the non-moving parties, are entitled to every favorable inference that can be drawn from the record. See Sharrar v. Felsing, 128 F.3d 810, 817 (3d Cir. 1997).

Because the parties disagree as to various facts, summary judgment would have been appropriate only if these factual disputes were immaterial. For the following reasons, we find that the factual discrepancies as presented by both parties are material, thereby making summary judgment improper.

9

B.      The Disputed Facts

1. Plaintiffs contend that they left the water immediately following Pomeroy's first announcement to do so.  In fact, they claim that other individuals remained in the water even after they had exited.  Pomeroy, on the other hand, argues that he had to repeatedly order Plaintiffs to leave the lake before they acquiesced.  Contrary to the District Court's statement "that the issue of when Plaintiffs exited the water is not a question of material fact," Opinion & Order at 2 n.2, the time Plaintiffs exited the water is material as it goes directly to whether they were similarly situated with other swimmers who were neither apprehended nor detained by the Rangers.

2. It is undisputed that Plaintiffs were swimming in their underwear, but it is far from clear that this fact alone made Plaintiffs dissimilar from the other swimmers for equal protection purposes.  Pomeroy did not testify that no other male swimmer wore a bikini or that the clothing Plaintiffs wore was substantially different from that worn by the other swimmers.  Furthermore, it was neither developed in the record nor known in response to our questions at oral argument whether there was a sign at the lake describing the required attire for swimming, potentially a significant fact for this appeal.

3. Plaintiffs contend that Pomeroy "[made] fun" of them when he called them "Mexican" in Spanish and approached them on the beach.  Dep. of Carrasca at 42.  The Rangers neither admit nor deny this allegation, but contend that even if Pomeroy made such a statement, it failed to show discriminatory intent.  Br. of Rangers at 43.

4. The reason Pomeroy asked for the Plaintiffs' green cards is in question.

10

Plaintiffs see this as an indication of his discriminatory intent toward them as Mexicans. The Rangers contend that Pomeroy inquired about Plaintiffs' green cards simply for identification purposes and not to question their immigration status.

5.  Plaintiffs point to the questioning and subsequent arrest of Plaintiff Abimael Figueroa as evidence of discriminatory intent and racial profiling because she was on the beach and not swimming when Pomeroy approached her.  They note that non-Hispanics who were on the beach were not stopped or questioned.  Pomeroy did not testify that he observed her swimming after hours, relying only on the fact that she pled guilty to the summons.

6.  Plaintiffs contend that they were seized in violation of the Fourth Amendment. The District Court stated that "Plaintiffs cannot point to any evidence which indicates that Pomeroy acted without probable cause when he detained Plaintiffs for investigatory purposes."  Opinion & Order at 4 n.4.  The court stated that "the undisputed evidence produced demonstrates that . . . Pomeroy approached Plaintiffs after he witnessed them swimming after hours when lifeguards were off duty."  Opinion & Order at 4 n.4.  As noted earlier, Plaintiffs concede swimming after hours.  The crux of their case lies in the alleged differential treatment of Plaintiffs and non-Hispanics.

7.  The length of the detention is at issue.  Pomeroy and the District Court refer to the length of the detention as two hours.  Plaintiffs testified they were held between three to four hours and were handcuffed to their chairs.  Pomeroy offered no explanation for the restraint, and the District Court did not refer to it.

11

8. Plaintiffs testified that Losey helped handcuff them at the time of the arrests, participated in the search of their vehicle, and helped handcuff Plaintiffs to chairs at the Park office. Nevertheless, the District Court stated it was "undisputed that Defendant Losey played little or no part in the events that occurred at the park." Opinion & Order at 3 n.3.

C.      Relevance of the Disputed Facts

Plaintiffs' principal legal argument is that the unequal treatment to which they were subjected on the day in question constituted racial profiling in violation of their equal protection rights and therefore a violation of the federal statutes invoked. Whether Plaintiffs are correct that the Rangers engaged in racial profiling, selectively enforcing the Park's swimming hours against them and not against others similarly situated to them, due to their race, is a factual issue which the District Court was not free to decide and as to which we necessarily express no view. To prevail on an equal protection claim in the racial profiling context, Plaintiffs would have to show that the challenged law enforcement practice had a discriminatory effect and was motivated by a discriminatory purpose. See Bradley v. United States, 299 F.3d 197, 205 (3d Cir. 2002). To prove discriminatory effect, Plaintiffs must show that they are members of a protected class and "similarly situated" persons in an unprotected class were not prosecuted for swimming after hours. Id. at 206.

It is unquestionable that, as Mexicans, Plaintiffs are members of a protected class, so the judicial inquiry must be limited to whether or not Plaintiffs have submitted evidence

12

that the Rangers enforced the swimming hours' regulations against them, rather than other similarly situated non-Hispanic individuals, because of their race. If Plaintiffs' testimony is believed, they have provided sufficient evidence to survive a summary judgment motion. It appears that the District Court accepted Pomeroy's version of the facts, which is unacceptable on summary judgment.

If one accepted Plaintiffs' version of the facts, a fact finder could determine that the Rangers singled out Plaintiffs, rather than other non-Hispanic similarly situated swimmers, for enforcement of the swimming hours regulations, and that Pomeroy's reference to Plaintiffs as "Mexicans," arguably stated as a pejorative racial slur, demonstrates that the Rangers acted with a racially discriminatory purpose. See Bradley, 299 F.3d at 205. See also Mody v. City of Hoboken, 959 F.2d 461, 467 (3d Cir. 1992) (noting that a racial slur by police officer may be proof of racially-motivated police conduct).

Because it is apparent that we must return this case to the District Court we consider for its benefit and that of the parties some of the other issues that must be considered on remand. The District Court treated all Plaintiffs together, notwithstanding Plaintiffs' uniform statement under oath that Abimael Figueroa was on the beach, not in the water, when Pomeroy arrived at the swimming area, a fact Pomeroy did not dispute. Presumably, the District Court accepted, without discussion, the Rangers' argument that because Ms. Figueroa pled guilty and paid a fine for a summons for swimming after hours, the doctrine of judicial estoppel bars her from challenging the Rangers' assertion that she was swimming after hours. Br. of Rangers at 25.

13

However, it has been established that judicial estoppel can be imposed only if: "(1) the party to be estopped is asserting a position that is irreconcilably inconsistent with one he or she asserted in a prior proceeding; (2) the party changed his or her position in bad faith, i.e., in a culpable manner threatening to the court's authority or integrity; and (3) the use of judicial estoppel is tailored to address the affront to the court's authority or integrity." Montrose Med. Group v. Bulgar, 243 F.3d 773, 777-78 (3d Cir. 2001). In the somewhat comparable situation of collateral estoppel, the Supreme Court has recognized that there are a number of reasons why a defendant would plead guilty when the issues were not litigated, see Haring v. Prosise, 462 U.S. 306, 318-19 (1983), and this court has so stated where the original plea was for a non-indictable offense, see Anela v. City of Wildwood, 790 F.2d 1063, 1068 (3d Cir. 1986), relying on Matter of Tanelli, 477 A.2d 394 (N.J. Super. 1984).

Whether Ms. Figueroa's guilty plea to the summary offense of swimming after hours and payment of a fine bars her from claiming that she was not in the water must be considered by the District Court on remand. In that connection, the court may take into consideration the absence of any evidence that she has made her claim in bad faith, that she speaks little English, and that she appears to have been confused by the summons. Furthermore, Ms. Figueroa never appeared in municipal court to contest the summons, but instead the Plaintiffs' employer arranged for them to pay the fee through the mail. (Dep. of Abimael Figueroa at 55; Dep. of Carrasca at 69).

Another issue that requires further analysis is the relevance of Plaintiffs'

14

immigration status. Although the Rangers seek to justify their questioning and apprehension of Plaintiffs for swimming after hours, and the District Court based its decision on that ground, the fact remains that Pomeroy contacted the INS repeatedly to determine if the INS wished to question Plaintiffs. In their brief, the Rangers argue that Pomeroy had probable cause to arrest Plaintiffs for, inter alia, "violating the Federal Immigration laws." Br. of Rangers at 32. Plaintiffs argue that state law enforcement officers cannot stop and inquire about an individual's immigration status based solely on his or her Mexican appearance. See United States v. Brignoni-Ponce, 422 U.S. 873, 887 (1975). The Rangers contend they released Plaintiffs after an interpreter supplied their names, but the "interpreter" was Pomeroy's daughter whom he contacted by telephone and the record does not show that she was unavailable before the Rangers took Plaintiffs into custody. The Rangers argue Pomeroy simply wanted identification when he asked Plaintiffs for their green cards. However, the record fails to show whether Pomeroy asked Plaintiffs for their names before requesting their green cards. It appears to be uncontested that when Plaintiffs failed to produce green cards, Pomeroy immediately contacted the INS, handcuffed and transported Plaintiffs to the Park office, and made repeated calls to the INS, even offering to transport Plaintiffs to any INS facility in New Jersey. We cannot summarily dismiss Plaintiffs' contention that Pomeroy's initial request for immigration documentation and subsequent detention was based solely on Plaintiffs' appearance as Mexicans, lending support to their contention that Pomeroy had a racially discriminatory purpose when apprehending Plaintiffs and further bolstering their racial profiling claim.

15

The District Court held that all of Plaintiffs' federal claims brought pursuant to their detention must be dismissed because Pomeroy had probable cause to detain them for violations of state and federal laws. That holding is dependent on the District Court's further statement that "Plaintiffs cannot point to any evidence which indicates that Pomeroy acted without probable cause when he detained Plaintiffs for investigatory purposes." Opinion & Order at 4 n.4. It is questionable whether the interest in issuing a summons to persons swimming less than a half hour after the lake's closing time is a reasonable basis for an investigatory detention. The violation of a park regulation may seem to a fact finder to be an inadequate basis for further investigation, much less for detention while handcuffed to chairs between two to four hours, depending on whose version is accepted. The Rangers and the District Court further justify Plaintiffs' detention on the grounds of either breach of the peace or threat to public safety. Notably, there is nothing in the record to suggest that Plaintiffs engaged in such conduct. See State v. Hurtado, 529 A.2d 1000, 1006-07 (N.J. Super. 1987) (dissenting opinion), rev'd, 549 A.2d 428 (N.J. 1988).

Even if the Rangers had probable cause to arrest Plaintiffs, the District Court could not dismiss all of the federal claims based on such a finding. "The fact that there was no Fourth Amendment violation does not mean that one was not discriminatorily selected" for enforcement of a law. Bradley, 299 F.3d at 205. Plaintiffs' equal protection claims under the Fourteenth Amendment require a wholly separate analysis from their claims under the Fourth Amendment.

The Fourth Amendment requires the scope of a detention to be carefully tailored to

16

its underlying justification, see Florida v. Royer, 460 U.S. 491, 500 (1983), and there are no "hard-and-fast time limits" as to how long a detention may reasonably last, United States v. Montoya De Hernandez, 473 U.S. 531, 543 (1985). Because it is far from clear that arresting, handcuffing, and detaining Plaintiffs for four hours is carefully tailored to the Rangers' underlying justification of Plaintiffs swimming after hours, the jury must make this determination. It follows that Plaintiffs' Fourth Amendment claims were not appropriate for summary judgment.

Finally, the District Court held, with only brief discussion in a footnote, that the Rangers are entitled to qualified immunity. The court also stated that Pomeroy had "probable cause to detain [Plaintiffs] for violations of state and federal laws," but the only federal laws allegedly violated emerged, even under the District Court's analysis, once Plaintiffs were detained when "it became apparent to Pomeroy that Plaintiffs were violating federal immigration laws." Opinion & Order at 3 n.4. The court does not amplify this statement, and Plaintiffs argue that "mere illegal presence in the United States, as opposed to illegal entry into the United States, is not a criminal violation of federal immigration laws." Br. of Appellants at 39-40. Plaintiffs cite in support the decisions in Gonzalez v. City of Peoria, 722 F.2d 468, 476-77 (9th Cir. 1983), overruled on other grounds by Hodges-Durgin v. De La Vina, 199 F.3d 1037 (9th Cir. 1999), and United States v. Encarnacion, 239 F.3d 395, 399 (1st Cir.), cert. denied, 532 U.S. 1073 (2001).

There is too much uncertainty on this record of the state of the law with respect to state rangers' authority to detain immigrants in this pre-September 11 period to affirm the

17

District Court's holding of qualified immunity on that ground. The District Court's further statement that Pomeroy "did not violate clearly established law when he detained Plaintiffs because he reasonably believed Plaintiffs were violating state and <u>federal</u> laws when he witnessed them swimming in the lake after it had closed for the night," Opinion & Order at 4 n.5, appears to be somewhat overstated as no federal law was implicated, no evidence has been called to our attention of suspicion of criminal activity which might justify a stop under <u>Terry v. Ohio,</u> 392 U.S. 1, 22-24 (1968), and in any event it is unlikely that a reasonable police officer would believe that a <u>Terry</u> stop would justify detention under chains for several hours.

If, on remand, the District Court decides to base its holding on qualified immunity, more specificity will be required as to the regulations, state statutes and /or federal statutes that a reasonable police officer would have believed authorized the Rangers' actions taken.

## IV.

### Conclusion

As we stated at the outset, the true facts as to what happened on August 3, 1998, elude us. But they are the basis for all the legal theories that have developed around this case. It may be that the District Court had the correct impression of the situation, and that its decision will ultimately be upheld. But in light of the differing versions of the facts, any judgment was premature.

18

We will therefore vacate the order of summary judgment, and remand to the

District Court for further proceedings consistent with this opinion.

_____

By The Court:


/s/ Dolores K. Sloviter
Circuit Judge