NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-2469
_____

ADRIENNE YOUNG,
                                        Appellant
v.

CITY OF PITTSBURGH; COLLEEN BRUST; REYNE KACSUTA;
THOMAS NEE; MICHAEL FLYNN; NATHAN HARPER, Commander;
THOMAS MCCAFFREY; MARYLIN LAHOOD; COLLEEN SYPOLT;
LINDA FRANCIS; DEBBIE PUC; DAN TRBOVICH; PAUL LARKIN;
CHARLES HENDERSON
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 11-cv-00650)
District Judge:  Honorable Cathy Bissoon
_____

Submitted Under Third Circuit LAR 34.1(a)
March 7, 2014

Before:  RENDELL, SMITH and HARDIMAN, *Circuit Judges*.

(Filed: April 4, 2014)


HARDIMAN, *Circuit Judge*.

        Adrienne Young appeals the District Court's summary judgment in favor of the

City of Pittsburgh and individual Pittsburgh police officers (collectively, City

Defendants), and an order dismissing her claims against seven Allegheny County

probation officers (County Defendants).[1] We will affirm.

I

This case arises out of four arrests of Plaintiff Young by Pittsburgh Police. Because Young's challenge to the District Court's summary judgment depends on the historical and procedural facts of the case, we recount them in some detail.

The trouble began for Young around 2:30 a.m. on May 13, 2008, as she drove her Chevrolet Cobalt in the Friendship area of Pittsburgh. Officer Colleen Brust was on patrol that morning when she saw Young's car cross the center line of a two-lane street and pull up alongside another car. Young then slowed down and moved back over, but as she did, the right front passenger side of her Chevrolet made contact with the other car's driver's side rear quarter. Officer Brust then activated the lights and sirens on her police cruiser and stopped both vehicles. Damage to both cars was minimal, and there were no injuries.

After Officer Brust effectuated the traffic stop, Young got out of her car and told Brust that the other driver had underage girls and drugs in his car. Brust called for backup, and two other officers arrived, including Sergeant Charles Henderson. Young returned to her vehicle while Brust spoke with the driver of the other car, Thomas Doswell, who had two female passengers. Doswell told Brust that Young was his ex-girlfriend and that she had been harassing him since their breakup. Young claimed that

---

[1] The City Defendants are Colleen Brust, Reyne Kacsuta, Thomas Nee, Michael Flynn, Nathan Harper, and Charles Henderson. The County Defendants are Thomas McCaffrey, Marylin Lahood, Colleen Sypolt, Linda Francis, Debbie Puc, Dan Trbovich, and Paul Larkin.

2

after Officer Brust returned from Doswell's car, her demeanor changed, and Brust told Young she was going to jail for trying to "hurt" Doswell's passengers. Young complained further that Brust had a male police officer pat her down, and when Young asked why Brust could not perform the search, Brust told her to shut up and added that she "would be getting three counts of aggravated assault."

Based on Brust's observations and the recommendation of Sergeant Henderson, Young was arrested at the scene and charged with first-degree aggravated assault, 18 Pa. Cons. Stat. § 2702(a)(1); reckless endangerment of another person, 18 Pa. Cons. Stat. § 2705; violation of a no passing zone, 75 Pa. Cons. Stat. § 3307; and reckless driving, 75 Pa. Cons. Stat. § 3736. Brust noted in a deposition that before talking to either party, she had seen "[Young] cross the center line and . . . get up to [Doswell's] vehicle and attempt to ram her vehicle." A141-42. Brust explained that she charged Young with aggravated assault because she could have caused serious bodily injury when she rammed Doswell's car. Young was taken into custody and spent a night in the Allegheny County Jail.

Within a few days of her arrest, Young filed a complaint against Brust with the City of Pittsburgh's Office of Municipal Investigations (OMI). Several weeks later, Young attempted to withdraw the complaint on the advice of a private detective who suggested she do so "to ensure that her ordeal with the police would come to an end." Young Br. at 12. Pursuant to OMI policy, however, the investigation continued.[2]

On July 22, 2008, Young appeared for a preliminary hearing before a magistrate.

---

[2] On March 2, 2009, OMI issued its final report on Young's complaint, exonerating Brust of wrongdoing in connection with the May 13, 2008 incident.

After Doswell's passengers testified and Young presented photos of the damage to the two cars, the magistrate cut the hearing short, calling the incident "nothing more than a light fender bender" and giving the parties five minutes to get together to "figure out where you're going with this" and "work out what charges we're going to hold here." A247. The parties were unable to reach a resolution, however, which prompted the magistrate to say:

> Okay. I'll tell you what I'm doing. It's a garbage case. It shouldn't have been here. I'm dismissing everything without prejudice, subject to re-filing. Get the charges good.

A248.

In the meantime, the OMI investigation continued, and on September 16, 2008, Brust and Henderson were interviewed in connection with Young's complaint. When interviewed by OMI, Brust and Henderson stated that they intended to refile the charges. Brust added that she planned to do so, at least in part, "for [her] credibility." A155.

On October 7, 2008, Brust re-filed charges against Young for the May 13 incident. The charges were substantially similar as before, except that the aggravated assault charge was downgraded to second-degree, 18 Pa. Cons. Stat. § 2702(a)(4). Lieutenant Reyne Kacsuta approved the re-filed charges, which were also reviewed and approved by the Allegheny County District Attorney's Office. Based on the averments in the criminal complaint, a magistrate issued an arrest warrant for Young.

Pursuant to the warrant, Young was arrested at her home in the predawn hours of October 8, 2008. Young asked if she could change her clothes before going to jail, and

4

Kacsuta, a female officer, accompanied her to her bedroom while she did so. Young

claims that Kacsuta watched her undress and called her a "religious nut." Although

Kacsuta disputes that she watched Young undress or called her names, she concedes that

she entered Young's bedroom because Young was under arrest and it would have been

inappropriate to allow her to move about her home unsupervised. Young was released on

her own recognizance later that day.

Following her second arrest, Young met with then-Pittsburgh Police Chief Nathan

Harper to discuss her initial arrest in May and her belief that her second arrest in October

was in retaliation for her OMI complaint. Young appeared before a magistrate on

November 18, 2008; the aggravated assault charges were again dismissed, but the

remaining charges were held over for trial.

About six weeks later, Young called the Zone 5 police station and complained that

Doswell had been harassing her with repeated phone calls. Detective Thomas Nee

investigated the complaint, obtained phone records, and determined that Doswell had, in

fact, called Young. In the course of his investigation, however, Detective Nee also

discovered that Young had made phone calls to a number registered to Doswell, in spite

of the fact that in July 2008 Doswell had obtained a protection from abuse order that

prohibited Young from contacting him.

Nee discussed his findings with his boss, Kacsuta, who told him Young had

violated the order and should be arrested. Nonetheless, Nee was unsure that probable

cause existed to arrest Young for indirect criminal contempt, so he sought advice from

Assistant District Attorney David Spurgeon, who recommended further investigation. Nee then called Doswell to see if Young had contacted him. Doswell refused to answer Nee directly, but confirmed that the number belonged to him and that the phone was in his possession. Doswell's refusal to cooperate gave Nee pause, but Kacsuta continued to pressure him to obtain a warrant. Nee talked to another assistant district attorney, Rebecca Auld, who was prosecuting the charges stemming from the May 13 incident; she, in turn, spoke with her supervisor, who recommended that Nee not obtain a warrant, although she did confirm that Young had violated the court order.

In light of Nee's continued reluctance to file charges against Young for violating the order, Kacsuta ordered him to draft a report explaining why he had twice disregarded her orders to obtain a warrant for Young's arrest. Although Nee did not want to file the charges, he ultimately did so on January 28, 2009, on Kacsuta's orders. A magistrate approved an arrest warrant, and Young was arrested at her home "in the middle of the night" on January 29, 2009. Kacsuta participated in the execution of the arrest warrant and Young again claims that Kacsuta accompanied her to her bedroom and called her a religious nut. Young was released on bond the same day as her arrest. The charges were continued until the expiration of the protection from abuse order on July 10, 2009, and never proceeded further.

Young was arrested a fourth time in March 2009. This time, the impetus for the arrest came from Renee Taylor, one of Doswell's passengers from the May 13, 2008 incident, who called the Zone 5 police station complaining that she had received a

6

threatening phone call from Young. Later that day, Taylor went to the police station to make a report and was interviewed by Pittsburgh Police Officer Michael Flynn. Kacsuta was the supervisor in the station at that time. In the affidavit of probable cause, Flynn stated that Taylor told him Young had been intimidating and harassing her and threatened to burn down her house in Wilkinsburg for not cooperating with Young's OMI complaint. The affidavit also stated that Taylor believed Young was upset with Taylor for testifying against her; that Taylor had seen Young sitting in her car on Taylor's street several times in the past week; and that Taylor had received several phone calls from a private number threatening her life if she did not drop the charges against Young. Flynn also averred that Taylor was in Pittsburgh at the time she received the phone calls.[3] At the time he prepared his affidavit, Flynn was unaware that Taylor's criminal history included several *crimen falsi*.

Based on Taylor's complaint, Young was charged with misdemeanor violations of intimidation of a witness, 18 Pa. Cons. Stat. § 4952(a), and terroristic threats, 18 Pa. Cons. Stat. § 2706(a)(1). A magistrate approved an arrest warrant, and Young was arrested for the fourth time, at about 2 a.m. on March 5, 2009, at her home. Once again, Kacsuta was part of the team serving the warrant. Young was taken to the Allegheny

---

[3] Flynn's affidavit contained several inconsistencies. First, Flynn claimed that he knew Young had committed a crime from "personal observations and victims' statements"; according to Flynn, this was a typo, and the affidavit itself did not contain claims that Flynn had personally observed anything. Second, Flynn stated in his deposition that Taylor never told him she had received a phone call threatening her life. Also, Flynn transposed Young's name and Taylor's name in part of the affidavit, which he corrected by filing a supplemental report later in the month.

County Jail and held there for more than three weeks while she waited for an electronic monitoring device to become available.

Young remained on electronic monitoring until August 2009. The following month, Detective Nee emailed ADA Auld and Commander Ross of the Pittsburgh Police and notified them that Taylor's phone records appeared to support Young's contention that she had not called Taylor on March 4, 2009. In February 2010, the District Attorney (DA) chose not to prosecute the charges. Finally, in February 2010, Young went to trial on the remaining charges from the initial May 13, 2008 incident, and was found guilty of the summary offense of passing where prohibited. All other charges were dismissed by the court.

II

In May 2011, Young filed a complaint in the Allegheny County Court of Common Pleas, alleging myriad constitutional violations. Defendants removed the case to the United States District Court for the Western District of Pennsylvania. In her second amended complaint, Young sued the City Defendants, in various combinations, for false arrest and malicious prosecution under the Fourth Amendment and 42 U.S.C. § 1983 in connection with all four arrests (Counts I–VIII); retaliatory prosecution in connection with her last three arrests, in violation of the First Amendment (Count IX); invasion of privacy against Kacsuta, in violation of the Fourth Amendment and in connection with the October 8, 2008 arrest (Count X); and violation of her First and Fourteenth Amendment rights to equal protection, freedom of religion, and to petition the

8

government, in connection with the arrests (Count XI). She also sued the County

Defendants and several City Defendants for intentional infliction of emotional distress

(Count XII) and conspiracy to deprive her of her Fourth, Fifth, and Fourteenth

Amendment rights (Count XV). Finally, Young sued the County Defendants for violating

her Fourth, Fifth, and Fourteenth Amendment rights (Count XIII) and for wrongful

imprisonment in connection with her detention for the fourth arrest (Count XIV).

The District Court held a post-discovery conference on June 1, 2012. There,

Young was represented by counsel and agreed to voluntarily dismiss her lawsuit against

the County Defendants. Consequently, the County Defendants did not seek summary

judgment. In her response to the City Defendants' motion for summary judgment, Young

reiterated that she had voluntarily agreed to dismiss the claims against the County

Defendants. The County Defendants' attorney sent Young's attorney a Rule 41(a) notice

of voluntary dismissal, but it was never filed.

In March 2013, the District Court granted summary judgment in favor of the City

Defendants. At about the same time, Young's attorney sought to withdraw because

Young had changed her mind about dismissing the County Defendants and ordered him

not to file the notice of dismissal, despite having already agreed to dismiss the claims

against the County Defendants. According to the District Court, Young's counsel also

"explained that discovery had revealed no plausible theory of recovery against the

County Defendants." Order Granting Motion to Enforce Settlement Agreement, April 23,

2013, ECF No. 98. The District Court subsequently allowed Young's counsel to

withdraw and also granted the County Defendants' motion to enforce the settlement agreement. This timely appeal followed.[4]

                                    III

We review the District Court's summary judgment de novo, viewing the facts and making all reasonable inferences in the light most favorable to the nonmoving party. *Montone v. City of Jersey City*, 709 F.3d 181, 189 (3d Cir. 2013). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The District Court properly granted summary judgment on Young's claims for false arrest and malicious prosecution because probable cause existed for all four arrests. The absence of probable cause is an essential element of both false arrest and malicious prosecution claims, and such claims cannot proceed if probable cause existed—regardless of whether the arrests at issue were a wise or typical use of police resources. *See Dowling v. City of Philadelphia*, 855 F.2d 136, 141 (3d Cir. 1988) ("The proper inquiry in a section 1983 claim based on false arrest . . . is not whether the person arrested in fact committed the offense but whether the arresting officers had probable cause to believe the person arrested had committed the offense."); *McKenna v. City of Philadelphia*, 582 F.3d 447, 461 (3d Cir. 2009) ("To prevail on a malicious prosecution claim under section 1983, a plaintiff must show . . . the proceeding was initiated without probable

---

[4] The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367. We have jurisdiction under 28 U.S.C. § 1291.

cause . . . . ”).

Under the Fourth Amendment, an arrest is permissible “where there is probable cause to believe that a criminal offense has been or is being committed.” *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). “Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest.” *Id*. Probable cause “requires more than mere suspicion . . . [but] does not require that the officer have evidence sufficient to prove guilt beyond a reasonable doubt.” *Orsatti v. N.J. State Police*, 71 F.3d 480, 482–83 (3d Cir. 1995). Rather, we consider the existence of probable cause via a “common sense approach” based on the totality of the circumstances, *Paff v. Kaltenbach*, 204 F.3d 425, 436 (3d Cir. 2000), and viewed from the perspective of an objectively reasonable police officer. *Maryland v. Pringle*, 540 U.S. 366, 371 (2003). The constitutional validity of an arrest does not depend on whether the accused actually committed any crime, or whether a person is later acquitted of the crime of arrest. *Wright v. City of Philadelphia*, 409 F.3d 595, 602 (3d Cir. 2005).

A district court may conclude “that probable cause exists as a matter of law if the evidence, viewed most favorably to Plaintiff, reasonably would not support a contrary factual finding.” *Merkle v. Upper Dublin School Dist.*, 211 F.3d 782, 788–89 (3d Cir. 2000). Where an arrest is made pursuant to a warrant—as were Young’s last three arrests—the plaintiff challenging probable cause must show “by a preponderance of the evidence: (1) that the police officer knowingly and deliberately, or with a reckless

11

disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) that such statements or omissions are material, or necessary, to the finding of probable cause." *Wilson v. Russo*, 212 F.3d 781, 786–87 (3d Cir. 2000). Here, even if Young could satisfy the first hurdle, a doubtful proposition at best, she would fail on the second. Therefore, based on the record before us, and viewed in the light most favorable to Young, we agree with the District Court that probable cause existed for all four of Young's arrests. Accordingly, her claims for false arrest and malicious prosecution (Counts I-VIII) were properly rejected.[5]

Young also challenges Kacsuta's observation of her as she changed clothes in her bedroom upon her second arrest as an invasion of privacy under the Fourth Amendment (Count X). As the District Court correctly concluded, however, "[b]ecause [Young] was the subject of a lawful custodial arrest," Kacsuta's actions did not violate the Fourth Amendment, and Young's "apparent position that she should have been allowed access to her bedroom without officer supervision [while under arrest] is, to put it bluntly, absurd." No. 11-CV-650, 2013 WL 1290950 at *10 (W.D. Pa. Mar. 26, 2013).

Nor do we find any error in the District Court's summary judgment on Young's equal protection claim (Count XI). "The fact that there was no Fourth Amendment violation does not mean that one was not discriminatorily selected" for law enforcement action. *Bradley v. United States*, 299 F.3d 197, 205 (3d Cir. 2002); *see also Carrasca v.*

---

[5] The existence of probable cause also dooms Young's First Amendment retaliatory prosecution claim (Count IX). *See Hartman v. Moore*, 547 U.S. 250, 265–66 (2006).

12

*Pomeroy*, 313 F.3d 828, 836 (3d Cir. 2002). However, it is axiomatic that an equal protection claim in this context requires the plaintiff to show the official action "(1) had a discriminatory effect and (2) [was] motivated by a discriminatory purpose." *Bradley*, 299 F.3d at 205. Here, Young has cited no evidence of record to suggest discriminatory effect, so this claim cannot proceed.

Finally, because Young did not present evidence that she suffered a constitutional violation, summary judgment was appropriate on her claims for supervisory liability, municipal liability, and conspiracy to violate her constitutional rights. For the reasons stated in its opinion, the District Court also appropriately granted summary judgment for Defendants on Young's state-law claim for intentional infliction of emotional distress (Count XII). We have considered the parties' arguments on these points and conclude that no further analysis is necessary. Accordingly, we will affirm the District Court's summary judgment in favor of the City Defendants.

IV

Apart from her challenge to the District Court's summary judgment in favor of the City Defendants, Young appeals the District Court's order dismissing the County Defendants. That order was based not on an adjudication of the merits, but rather on Young's representation to the Court that she would voluntarily dismiss the County Defendants. Young claims that the District Court erred when it dismissed the County Defendants, but this argument is unavailing. Young does not dispute that she orally represented to the District Court that she would voluntarily dismiss the County

Defendants, a position she reiterated in subsequent court filings, *see* Dkt. 83 at 10. The District Court, adverse parties, and Young's attorney all reasonably relied upon that representation, and we hold that promise is enforceable. *See, e.g., Edwards v. Wyatt*, 335 F.3d 261, 276–77 (3d Cir. 2003) (describing the elements of promissory estoppel).[6] Thus, the District Court did not abuse its discretion in dismissing the County Defendants.[7]

\* \* \*

On the record presented, the District Court did not err when it concluded as a matter of law that probable cause existed for all four of Adrienne Young's arrests. That holding doomed most of Young's claims, and for the reasons we and the District Court stated, her other claims against the City Defendants also fail. As for Young's claims against the County Defendants, judgment was properly entered against her because she had agreed to dismiss them. Accordingly, we will affirm the judgment of the District Court in all respects.

---

[6] In addition, given Young's oral representation to the District Court and to adverse parties, dismissal arguably also would have been proper under a contract theory, *see, e.g.*, Restatement (Second) of Contracts § 94, or pursuant to Rule 41 of the Federal Rules of Civil Procedure. *See, e.g., Role v. Eureka Lodge No. 434*, 402 F.3d 314, 318 (2d Cir. 2005).

[7] Although we find no abuse of discretion by the District Court, we note that this case highlights the importance of having a court reporter available to record promises made by any party. To avoid problems such as the one encountered here, district courts should present to the parties a Rule 41(a) stipulation of dismissal that can be signed contemporaneously with the oral promise and promptly filed thereafter.

14